**Jeffrey McDERMOTT, Donna McDermott, and McDermott Group, Inc., Plaintiffs,**

v.

**PARTY CITY CORP. and Philip Nasuti, Defendants.**

**Civil Action No. 95–3683.**

United States District Court, E.D. Pennsylvania.

June 30, 1998.

614

Kevin F. Berry, Ledgewood Law Firm, Philadelphia, PA, for Plaintiffs.

James A. Keller, Paul Hummer, Saul, Ewing, Remick & Saul, Philadelphia, PA, Edwin N. Popkin, Langhorne, PA, Frederic J. Schragger, Lawrenceville, NJ, for Defendants.

## MEMORANDUM

EDUARDO C. ROBRENO, District Judge.

Donna and Jeffrey McDermott, individually and on behalf of the McDermott Group, Inc., (collectively "plaintiffs"), initiated this lawsuit against defendant Philip Nasuti ("Nasuti"),[1] asserting both contract and tort claims. Plaintiffs alleged that Nasuti breached a stock purchase agreement, under which Nasuti was to purchase stock in, and perform management services for, the McDermott Group, Inc. ("the McDermott Group"), a Pennsylvania corporation formed by the McDermotts for the sole purpose of operating a Party City franchise store in King of Prussia, Pennsylvania ("the store").[2] Plaintiffs also contend that Nasuti owed a fiduciary duty to the McDermott Group, arising from Nasuti's position as manager of the McDermott Group store and as an agent of the McDermotts. Plaintiffs claimed that Nasuti breached this fiduciary duty by permitting the store to fail, abandoning it, and usurping business opportunities to benefit Nasuti's own ventures; and converted McDermott Group property and McDermott Group employees' time for his own benefit. Plaintiffs sought damages from Nasuti related to the liquidation of the store as a result of Nasuti's alleged breach of contract and tortious conduct, and also claimed punitive damages. Nasuti, in turn, filed a counterclaim against the McDermott Group for an accounting.

The case was tried before a jury, which rendered a verdict in plaintiffs' favor on the contract claim for $376,489.49[3] on the breach of fiduciary duty claim for $137,000, and assessed punitive damages against Nasuti in the amount of $375,000, for a total of $888,489.49. The jury, however, found that plaintiffs had not proved that Nasuti converted the McDermott Group's property. Finally, the jury found for the plaintiffs on Nasuti's counterclaim.

Before the Court are Nasuti's post-trial motions claiming various points of legal and trial error, and requesting judgment as a matter of law, a new trial, or in the alternative, remittitur, and plaintiff's motion to amend judgment to add prejudgment interest. For the reasons stated herein, the Court will grant in part Nasuti's motion for judgment as a matter of law and deny it part, and will grant plaintiff's motion to amend the judgment to add prejudgment interest. The Court will, therefore, reduce the amount of compensatory damages by $111,962.39, add prejudgment interest of $65,387.01, and will enter an amended judgment in plaintiffs' favor in the amount of $841,914.11. Nasuti's motions for a new trial, or in the alternative remittitur, will be denied.

## I. FACTS

Donna and Jeffery McDermott decided to open a franchise operation as a family business in 1992. After engaging in extensive research they settled on a store that would sell party goods. For the purposes of owning and operating the store, the McDermotts formed the McDermott Group, of which they owned 100 percent of the stock. On November 23, 1993, the McDermott Group, entered

---

1. At the time the complaint was filed, Party City Corporation ("Party City Corp.") was also a defendant, however, plaintiffs reached a settlement with Party City Corp., and, on May 3, 1996, Party City Corp. was dismissed from the lawsuit.

2. Party City stores sell party goods such as plates and napkins. (Tr. 8/21/97 at 28.)

3. Specifically the jury found that Nasuti owed plaintiffs $118,980 attributed to the lease of the store, $71,400 attributable to the loan by Royal Bank, $112,200 attributable to vendor debt, $56,409.49 attributable to Nasuti's failure to pay cash for his share of the McDermott Group, $17,500 resulting from the McDermott's sale of mutual funds resulting from Nasuti's breach, and zero dollars attributable to lost future profits.

into a franchise agreement with Party City Corporation ("Party City Corp.") to operate a Party City franchise store in King of Prussia, Pennsylvania.[4]

On February 4, 1994, the McDermott Group obtained a loan ("the loan agreement") from Royal Bank for the amount of $200,000 to finance the Party City franchise venture. The McDermotts individually guaranteed the loan. The loan agreement required, inter alia, that the McDermott Group obtain Royal Bank's written consent prior to any change in the McDermott Group's ownership or control.

The McDermott Group store opened on March 19, 1994. In May 1994, Jeffery McDermott learned that he had been transferred by his employer from the Philadelphia area to Arlington, Virginia. Donna McDermott then discussed with Party City Corp. selling all or part of the McDermott Group's assets to Party City Corp. The negotiations did not prove fruitful. In early July 1994, the McDermotts began discussions with Nasuti, who at the time was an owner of five other Party City franchises, and his stepson, Michael Brand,[5] to sell all or part of the store to Nasuti. On August 30, 1994, Nasuti entered into a contract to purchase 51 percent of McDermott Group stock ("the stock purchase agreement") for $56,409.49. As part of the transaction,[6] Nasuti also agreed to undertake the management of the store. Under the stock purchase agreement, Nasuti was to receive $5,000 per month as a management fee for running the store and $700 per month for office expenses. On August 31, 1994,

immediately following the signing of the stock purchase agreement, the McDermotts moved to Virginia and Nasuti took over the management of the store.

Under Nasuti's management, the store did not perform as well as projected during the Halloween season, the most important business season of the year. At the time, the McDermotts and Nasuti concluded that the poor business performance was due to a "cannibalization effect" caused by the presence of another Party City store nearby in East Norriton, Pennsylvania.[7] As a result, in November 1994, Donna McDermott, Nasuti, and officials from Party City Corp. began to discuss moving the store to a new location in the hopes of improving its performance.

In December 1994, at Nasuti's request, the McDermotts inspected a site at the Northeast Shopping Center, located at Roosevelt Boulevard and Welsh Road in Philadelphia, as a possible new location for the store. Thereafter, the McDermotts agreed to move the store to that location, and Party City Corp. approved the new site. At the same time, however, and unbeknownst to the McDermotts, Nasuti had been negotiating with Party City Corp. for several sites for his own new franchises, including a site located at the intersection of Cottman and Bustleton Boulevards, which was approximately three miles from the Northeast Shopping Center.[8]

In January 1995, Nasuti requested permission from the McDermotts to open a Party City store under his own name at the Cottman and Bustleton location.[9] The McDer-

---

**4.** Prior to signing the franchise agreement, on October 18, 1993, the McDermotts had entered into a lease for the store at a shopping center in King of Prussia.

**5.** Brand also serves as general manager of the Philip David Company which at the time of trial owned and managed several Party City franchises.

**6.** The management and management fee provision of the agreement is contained in Exhibit B to the stock purchase agreement, entitled "Shareholder Agreement." (Ex. P–2.)

**7.** The opening of the East Norriton store by Party City Corp., however, technically conformed to a 3.0 mile limit imposed by the franchise agreement between Party City Corp. and the McDermott Group. The franchise agreement provides:

The area granted pursuant to the terms of the franchise agreement shall be a minimum of a three-mile radius from the location indicated by attaching a map showing the location and the radius to Exhibit A of the franchise agreement.

Ex. P–1 at para. 12.6.

**8.** The parties dispute the actual distance between the two locations. Nasuti claims that according to his calculation, the distance between the stores exceeds three miles.

**9.** The parties dispute whether Party City demanded that Nasuti ask the McDermott's permission, or Nasuti contacted the McDermott's upon counsel's suggestion and "as a courtesy."

motts refused permission to Nasuti to open a store at the Cottman and Bustleton Boulevards location because they feared that its close proximity to the Northeast Shopping Center would damage the McDermott Group store's business. In fact, it was the proximity of another Party City store which the parties suspected had eroded the business of the store in King of Prussia.[10]

On February 9, 1995 a loan committee at Royal Bank considered both the approval of the stock purchase agreement of August 30, 1994 and the relocation of the store to the Northeast Shopping Center. The committee approved the stock purchase and the relocation with additional conditions, including that Nasuti and his wife, Helene Nasuti, personally guarantee Royal Banks's loan to the McDermott Group[11] and that Nasuti's management fee be reduced to $4,000 per month.

In March 1995, and without prior notice to the McDermotts, Nasuti instructed his attorney to "cancel the contract", because, in Nasuti's opinion, the McDermott's had breached their agreement by not investing adequate cash into the operation of the store. On March 13, 1995, Nasuti's attorney sent a letter to plaintiffs to that effect. The McDermotts contend that because Nasuti abandoned the store and at the same time also "impeded" the move of the store by planning to open his own store within three miles of the new location, they were faced with the choice of operating the store in King of Prussia or liquidating it.

In light of these circumstances, the McDermotts decided that the best option would be to liquidate the King of Prussia store. To carry out the liquidation, the McDermotts hired Stephen Cucinotti, an experienced liquidator. The store closed in April 1995, upon completion of the liquidation process. Shortly thereafter, Nasuti proceeded to open two other Party City stores—one at the Northeast Shopping Center site and

another at the Cottman and Bustleton Avenues site.

## II. LEGAL STANDARD [12]

### A. Judgement as a Matter of Law

■ In ruling on a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b), the evidence in the case must be viewed in the light most favorable to the successful party, and every reasonable inference therefrom must be drawn in that party's favor. See *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 190 (3d Cir.1992); *Fireman's Fund Ins. Co. v. Videfreeze Corp.*, 540 F.2d 1171, 1178 (3d Cir. 1976) ("The trial judge, in his review of the evidence, ... must expose the evidence to the strongest light favorable to the party against whom the motion is made and give him the advantage of every fair and reasonable inference"). It is impermissible to question the credibility of witnesses, or to weigh conflicting evidence as would a fact-finder. See *Parkway Garage, Inc. v. City of Philadelphia*, 5 F.3d 685, 691 (3d Cir.1993). Applying these precepts, a jury verdict can be displaced by judgment as a matter of law only if "the record is 'critically deficient of that minimum quantum of evidence from which the jury might reasonably afford relief.'" *Dawson v. Chrysler Corp.*, 630 F.2d 950, 959 (3d Cir.1980) (quoting *Denneny v. Siegel*, 407 F.2d 433, 439 (3d Cir.1969)), *cert. denied*, 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981).

### B. New Trial

■ Similar concerns restrict the Court's discretion in ordering a new trial pursuant to Federal Rule of Civil Procedure 59. "Such an action effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp, the prime function of the jury as the trier of the facts." *Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 90 (3d

---

10. In September 1995, following Nasuti's termination of the stock purchase agreement, he and Brand established a Party City franchise at the Cottman and Bustleton location.

11. According to the testimony of Daniel Gallagher, an officer of Royal Bank, the Small Busi-

ness Administration requires that anyone who owns more that 20 percent of a business personally guarantee the loan. (Tr. 8/25/97 at 34.)

12. The parties agree that Pennsylvania law controls in this diversity case.

Cir.1960) (en banc). A new trial on the basis that the verdict is against the weight of the evidence can be granted "only where a miscarriage of justice would result if the verdict were to stand." *Klein v. Hollings,* 992 F.2d 1285, 1290 (3d Cir.1993). Where the proffered basis is trial error, "[t]he court's inquiry ... is twofold. It must first determine whether an error was made in the course of the trial, and then must determine whether that error was so prejudicial that refusal to grant a new trial would be inconsistent with substantial justice." *Farra v. Stanley–Bostitch, Inc.,* 838 F.Supp. 1021, 1026 (E.D.Pa. 1993) (internal quotations omitted), *aff'd without op.,* 31 F.3d 1171 (3d Cir.1994); *see* Fed.R.Civ.P. 61. An error in jury instructions must be so substantial that, viewed in light of the evidence in the case and the charge as a whole, " 'the instruction was capable of confusing and thereby misleading the jury.' " *Link v. Mercedes–Benz of N. Am., Inc.,* 788 F.2d 918, 922 (3d Cir.1986) (quoting *United States v. Fischbach & Moore, Inc.,* 750 F.2d 1183, 1195 (3d Cir. 1984)).

### C. *Remittitur*

▮ Defendant argues, in the alternative, that the Court should grant a remittitur in this case due to the excessiveness of the damages awarded. Remittitur is appropriate if the Court "finds that a decision of the jury is clearly unsupported and/or excessive." *Spence v. Board of Educ. of Christina Sch. Dist.,* 806 F.2d 1198, 1201 (3d Cir.1986); *see* 11 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil* § 2815 (1973). If remittitur is granted, the party against whom it is entered can accept it or can proceed to a new trial on the issue of damages.

## III. DISCUSSION

### A. *Contract*

#### 1. Liability

Nasuti contends that he is entitled to judgment as a matter of law on the issue of contract liability because the evidence at trial did not support a finding that a condition precedent to the contract was satisfied. Specifically, Nasuti points to section 2.4(a) of the stock purchase agreement which provides:

> 2.4 *Conditions to Purchaser's Obligations.* The Purchaser's obligation to purchase two hundred four shares shall be subject to the following conditions at or before closing hereunder:
>
> (a) Royal Bank and the Small Business Administration shall have consented to the transactions described herein;

Ex. P–9 sec. 2.4. Nasuti argues that Royal Bank and the Small Business Administration ("SBA") did not actually approve the stock purchase agreement, and that this approval was required as a condition precedent to the his obligation to perform under the contract. Nasuti points to Royal Bank loan committee's minutes of February 9, 1995 which addressed the McDermott Group's "Request for Approval for the sale of 51% of the company and the relocation of the store." (Ex. P–13.) According to the minutes, "[t]he Committee approved the request with the following added conditions." Nasuti claims that the stock purchase agreement was not valid until the conditions listed, one of which was to "[t]ry to obtain Mrs. Nasuti's guaranty," were satisfied. Nasuti then argues that because his wife Helene Nasuti's guarantee was not obtained, the stock purchase agreement was never fully approved.[13]

Plaintiffs respond that the purchase of the stock was not conditioned upon such approvals being obtained, and that even if satisfaction of the condition was a predicate to performance, the condition was satisfied, excused or waived.

#### a. The condition was satisfied

▮ In a bilateral contract, if a condition precedent is not satisfied, the obligations of the non-performing party are discharged. *Francis Gerard Janson P.C. v. Frost,* 422 Pa.Super. 36, 618 A.2d 1003, 1006 (1993). The party alleging the breach of contract bears the burden of proof that the condition

---

**13.** The validity of the argument that Nasuti could defend against the enforcement of the stock purchase agreement on the basis that a condition precedent was not fulfilled is doubtful because, in this case, the condition ran to the benefit of Royal Bank, and not to Nasuti.

was satisfied. *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1007–1008 (3d Cir.1980) (applying Pennsylvania law). Jeffrey McDermott testified at trial that in August 1994 he received oral approval of the transaction without conditions from Daniel Gallagher, an officer of Royal Bank. (Tr. 8/26/97 at 47).[14] Further, the McDermotts' attorney who had negotiated the transaction, Jack Weiner, Esquire, testified at trial that based on his dealings with Royal Bank in this case it was his understanding that Royal Bank had approved the transaction. (Tr. 8/22/97 at 194–95.)[15] Based upon the evidence presented, the Court concludes that there was sufficient evidence on the record for a reasonable jury to find that the condition of prior approval by Royal Bank was satisfied.

### b. The condition was excused

#### i. Nasuti's misconduct impeded the satisfaction of the condition

■ Nasuti argues that the minutes of the loan committee's February 9, 1995 meeting imposed additional conditions precedent to the agreement. Nasuti specifically points to the alleged requirement that Nasuti's wife's personal guarantee be obtained. First, plaintiffs argue that Mrs. Nasuti's personal guarantee was not really a mandatory condition because the minutes stated only that Royal Bank would *"try* to obtain Mrs. Nasuti's guarantee." (Ex. P–13 (emphasis added).) Second, plaintiffs claim that even if Helene Nasuti's personal guarantee was a condition precedent which had not been satisfied, the reason it was not satisfied was because defendant himself refused to cooperate by not obtaining his wife's personal guarantee in "bad faith." Plaintiffs contend that Nasuti's argument that this "condition" was

not satisfied is a mere pretext, and that the testimony showed that Helene Nasuti routinely gave her personal guarantee in other business transactions. Because, according to plaintiffs, her failure to provide her personal guarantee in this instance was due to Nasuti's bad faith, the condition was excused.

■ If a party acts to hinder the satisfaction of a condition, the condition is excused. *Restatement (Second) of Contracts* § 225 cmt. b (1979). In other words, where a party claiming the condition has not been satisfied is the cause of the non-occurrence, he or she may not claim the non-occurrence to his or her advantage. *Commonwealth of Pennsylvania Dept. of Transp. v. W.P. Dickerson & Son, Inc.*, 42 Pa.Cmwlth. 359, 400 A.2d 930, 932 (1979); *Craig Coal Mining Co. v. Romani*, 355 Pa.Super. 296, 513 A.2d 437, 440 (1986) (A party "may not, in fact, take advantage of an insurmountable obstacle placed by himself in the path of another party's adherence to the agreement."). *See, e.g., In re Stroud Ford, Inc.*, 190 B.R. 785, 787 (Bankr. M.D.Pa.1995).

Helene Nasuti testified that, in fact, in the past she had signed all the personal guarantees her husband asked her to sign, (Tr. 8/26/97 at 90), that she had guaranteed debts for other Party City franchises owned by her husband, (Tr. 8/26/97 at 95), and that just recently she had guaranteed lease payments of $1.5 million for the Northeast Shopping Center (Ex. P–20). This evidence was sufficient to support a reasonable jury's finding that the condition was excused by Nasuti's hindrance of the satisfaction of the condition.

#### ii. Nasuti accepted performance

■ Plaintiffs also argue that because Nasuti accepted part performance under the

---

**14.** Plaintiffs also argue that the nowhere in the contract was there any requirement that the approval be in writing.

**15.** The court recognizes that there was evidence that the approval was subject to conditions. Plaintiffs also offered the testimony of Daniel Gallagher, an officer of Royal Bank, who explained that at the loan committee meeting, the transaction was approved with added conditions, (Tr. 8/25/97 at 11–12), a letter from Gallagher to Weiner addressing the approval of the transaction by Royal Bank, (Ex. P–32), and the minutes

of the Royal Bank loan committee's February 9, 1995 meeting, (Exs. P–13 and P–14), to confirm that the Royal Bank loan committee "approved the request with the following added conditions" (Tr. 8/25/97 at 11–12). It is not, of course, the job of the Court to weigh conflicting evidence, *see Parkway Garage*, 5 F.3d at 691, but only to determine whether the verdict is supported by at least "that minimum quantum of evidence," *see Dawson v. Chrysler Corp.*, 630 F.2d 950, 959 (3d Cir.1980).

Shareholder Agreement, any condition precedent was excused. *See Restatement (Second) of Contracts* § 247 (acceptance of part performance excuses the subsequent nonoccurrence of a condition) (1979). Plaintiffs produced evidence that Nasuti accepted the benefits of the management provision of the Shareholder Agreement in the form of his monthly management fee of $5,700. (Tr. 8/21/97 at 58, 73–82.). Therefore, the jury was entitled to find that the conditions were excused by Nasuti's acceptance of part performance.

### c. The condition was waived

▮▮▮▮ Further, plaintiffs explain that the condition was waived by Nasuti's performance under the contract. "Contractual provisions can be waived, expressly or impliedly." *Black Top Paving Co. v. Commonwealth of Pa. Dep't of Transp.*, 466 A.2d 774, 776 (1983). These provisions may be waived by a party's conduct "as long as the intent to waive may be reasonably inferred." *In re Imaging Equipment Services*, 143 B.R. 355, 359 (Bkrtcy.W.D.Pa.1992) (applying Pennsylvania law). Plaintiffs offered evidence that Nasuti affirmatively undertook his management obligations under the stock purchase agreement immediately upon signing the agreement and, as pointed out above, accepted payments for his services from the McDermott Group. Plaintiffs also offered testimony that they relinquished management of the store to Nasuti and that Nasuti began to manage the store immediately following the execution of the agreement. Once in charge of the store, Nasuti controlled inventory, budget, and purchasing decisions; adjusted payroll and assuming hiring and firing responsibilities; implemented his operating procedures in the store; taught employees how to buy inventory; transferred inventory between the store and other Party City stores owned by Nasuti; visited the store regularly; prepared receipts for spring inventory; attended meetings with Party City Corp.; attended buying meetings on behalf of the McDermott Group; and opened bank accounts in the name of "Party City King of Prussia" at the address of Nasuti's management company. (Tr. 8/21/97 at 73–82; 8/22/97 at 32–36, 39, 40–47.) This evidence supports a finding that because Nasuti undertook full and complete management of the store after the signing of the stock purchase agreement, and prior to Royal Bank formally consenting to the transfer of the stock, Nasuti waived the condition of bank approval.

### d. The condition was material

▮▮▮ Nasuti, now armed with new post-trial counsel, raises for the first time the argument that the condition of bank approval was material and, therefore, it could not be waived. Nasuti's current counsel argues that "since this is a legal issue on which the jury would not pass in any event, that it is preserved by Mr. Shragger's motion, which was an oral motion." (Tr. 4/17/98 at 8.) Assuming that this was an issue for the Court to decide, Nasuti, however, concedes that trial counsel did not raise this particular argument in his Rule 50 motions made either at the close of plaintiffs' case or at the close of all the evidence. *See* Tr. 8/26/97 at 75–78; 211–215. "Since [a Rule 50(b) ] motion is nothing more than a renewal of the earlier motion made at the close of the presentation of evidence, it cannot assert a ground that was not included in the earlier motion." 9A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2537, at 345 (2d ed.1994); *Chemical Leaman Tank Lines, Inc. v. Aetna Casualty and Sur. Co.*, 89 F.3d 976, 993 (3d Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 485, 136 L.Ed.2d 379 (1996). *See also Williams v. Runyon*, 130 F.3d 568, 571 (3d Cir.1997) ("Under normal circumstances, a defendant's failure to raise an issue in a Rule 50(a)(2) motion with sufficient specificity to the plaintiffs on notice waives the defendant's right to raise the issue in their Rule 50(b) motion."). Because Nasuti failed to raise the issue of the materiality of the condition in his Rule 50(a) and 50(b) motions, the issue was waived.

▮▮▮ Assuming that the materiality of the condition was an issue for the jury, plaintiffs argue that Nasuti waived this argument when he failed to submit a jury instruction or object to the absence of one on such grounds. *See* Def.'s Request for Charge (doc. no. 96); Tr. 8/27/97 at 16–25. The Court agrees that because Nasuti neither timely and appropriately raised the issue at trial, nor objected to the jury instructions, the issue of materiality

of the conditions was waived and may not be considered now on post trial motions. Fed. R.Civ.P. 51.[16]

In summary, on the contract claim, the Court agrees that, in viewing the evidence in the light most favorable to the prevailing party, and given the advantage of every fair and reasonable inference to the prevailing party, plaintiffs showed that the condition of bank approval was either satisfied, excused, or waived.

### 2. Damages

Based on its finding that Nasuti breached a contract between Nasuti and plaintiffs, the jury awarded plaintiffs $376,489.49. Nasuti complains generally, that the jury award on the contract claim exceeded plaintiff's expectation interest in the contract, i.e. that the award is excessive in relation to what plaintiffs would have received had the contract been performed.

#### a. Nasuti's failure to pay cash for his share of the McDermott Group

▆▆▆ Nasuti argues the because the jury's finding that he was liable on the contract claim was improper, plaintiffs are not entitled to collect the $56,409.49 awarded for Nasuti's failure to pay cash for 51 percent of stock in the McDermott Group as required by the stock purchase agreement. "Generally, a breaching party is liable for damages that would naturally result from the breach...." *Fort Washington Resources v. Tannen,* 901 F.Supp. 932, 943 (E.D.Pa.1995)(citing *Ebasco Servs., Inc. v. Pennsylvania Power & Light Co.,* 460 F.Supp. 163, 213 n. 62 (E.D.Pa.1978)). In this case, it is conceded by Nasuti that this amount flows directly from the breach of the contract. Because the jury concluded that Nasuti breached the agreement, it was proper for the jury to conclude that an award of damages flowing from the breach in the amount of $56,409.49 should be awarded to plaintiffs.

#### b. Consequential damages

Further, Nasuti contends that the contract damage award is excessive so as to constitute

---

**16.** Federal Rule of Civil Procedure 51 provides:

No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds for the objection. Fed.R.Civ.P. 51. The Third Circuit has interpreted this rule strictly. *Ryder v. Westinghouse Elec. Corp.,* 128 F.3d 128, 135 (3d Cir.1997), *cert. denied,* ── U.S. ──, 118 S.Ct. 1052, 140 L.Ed.2d 115 (1998).

The Court concludes that neither the jury lacked "adequate guidance on a fundamental question," nor would the "failure to consider the error ... result in a fundamental miscarriage of justice." *Failla v. City of Passaic,* 146 F.3d 149, 156 (3d Cir. 1998) (citing *United States v. 564.54 Acres of Land,* 576 F.2d 983, 987 (3d Cir.1978), *rev'd on other grounds,* 441 U.S. 506, 99 S.Ct. 1854, 60 L.Ed.2d 435 (1979)). In the cases collected by the Third Circuit in *564.54 Acres of Land* to support this apparent exception to Rule 51, the trial courts either gave the jury the equivalent of no instruction on the law, or gave them a legally incorrect instruction. *See Ratay v. Lincoln Nat'l Life Ins. Co.,* 378 F.2d 209 (3d Cir. 1967) (concluding that trial court instruction was clearly erroneous because it incorrectly stated the burden of proof in a fraud case); *Wilson v. American Chain and Cable Co.,* 364 F.2d 558 (3d Cir.1966) (concluding that trial court committed a fundamental error when it failed to define superseding cause and distinguish it from con-

current cause in a negligence case where causation was a pivotal issue); *Pritchard v. Liggett & Myers Tobacco Co.,* 350 F.2d 479, 486 (3d Cir.1965)(concluding that trial court in failed to correlate the law to the facts when its instructions did not distinguish between the two variations of the assumption of the risk defense, contributory negligence and misuse of product, in a case alleging breach of an express warranty); *McNello v. John B. Kelly, Inc.,* 283 F.2d 96, 102 (3d Cir.1960) (concluding that a fundamental error had been committed where the trial court failed to instruct the jury on the law applied to the facts "the question of liability ... was submitted to the jury with what was tantamount to no instructions at all"); *Mazer v. Lipschutz,* 327 F.2d 42, 52 (3d Cir.1963) (concluding the failure to review a legally incorrect jury instruction would result in a miscarriage of justice). *But see Trent v. Atlantic City Elec. Co.,* 334 F.2d 847, 859 (3d Cir.1964) (concluding that the court need not consider the contested instruction because "the evidence was more than sufficient to justify findings of negligence on [the jury's] part even under a more properly detailed charge."). In this case, Nasuti does not contend either that the Court failed to give the jury adequate guidance or that the Court gave an legally incorrect instruction, but rather, the Court, did not include an instruction that Nasuti failed to propose. Thus, the Court concludes that the exception to Rule 51 enunciated by the Third Circuit in *Failla* and *564.54 Acres* is not applicable in this case.

a windfall to plaintiffs that "shocks the conscience" and which must be reduced. Specifically, Nasuti argues that the jury's award for particular items, the store lease, the balance on the loan by Royal Bank, and the vendor debt, were improper in light of the well-settled rule that consequential damages must have been reasonably foreseeable to be compensable. Nasuti contends that the damages awarded flowed not directly from the breach of the stock purchase agreement, but from the McDermott's decision to liquidate the store prematurely and that the decision to liquidate could not have been foreseen by Nasuti at the time he entered into the contract with plaintiffs.

Plaintiffs respond that Nasuti should have known that the McDermotts would have to liquidate the store and accelerate debt payments when he breached the agreement. They explain that when Nasuti breached the contract, they were faced with two options: "(1) continue to operate the store at [the King of Prussia] location at which it was losing money ... or (2) close the store and curtail the losses they were sustaining." Pls.' Mem. at 27. Plaintiffs essentially argue that they used their best business judgment in deciding to liquidate the store. They contend that, "Nasuti cannot be permitted to breach his contract and second guess how the McDermotts tried to mitigate their damages afterward." *Id.* Plaintiffs also contend that the particular consequential damages they seek were also foreseeable, and point to the stock purchase agreement under which Nasuti agreed to indemnify plaintiffs for 51 percent of the debt to the landlord, to Royal Bank, and to the vendors, and the fact that Nasuti has made none of these payments.

■ The Court agrees with plaintiffs' arguments. First, Pennsylvania law distinguishes "between general damages—those ordinary damages that flow directly from the breach; and special or consequential damages—those collateral losses, such as expenses incurred or gains prevented which result from the breach." *Tannen,* 901 F.Supp. at 943 (citing *Ebasco,* 460 F.Supp. at 213 n. 62 (E.D.Pa.1978)). It is well-settled that to recover consequential damages, plaintiff must show specifically that defendant had

reason to know of the special circumstances causing the loss and that the injury was foreseeable. *Id.; Hadley v. Baxendale,* 9 Exch. 341 (1854). Foreseeability is to be determined from the point in time when the contract was formed. *Tannen,* 901 F.Supp. at 943; *Hazleton Area School District v. Bosak,* 671 A.2d 277, 282 (1996).

■ In this case, the Shareholder Agreement unambiguously states:

Nasuti further agrees to indemnify, defend and hold [the McDermotts] harmless from and against any loss or liability exceeding, as to each such separate liability equal to the McDermott Share. In the event any of such guarantees are called upon by the respective creditors of the [the McDermott Group], upon funding of their share by [the McDermotts], Nasuti shall immediately fund his share of the required payment.

Ex. P–11 at para. 6. It is clear from the plain language of the Shareholder Agreement that Nasuti agreed as part and parcel of his obligation under the agreement to be responsible for 51 percent of the debts owed by the McDermott Group. The balance owed to the vendors, to the landlord, and to Royal Bank are, therefore, recoverable because they were foreseeable.

■ Nasuti next argues that plaintiffs have already recovered for the loss on the lease, the loan, and the vendor debt through plaintiffs' settlement with Party City Corp. in which Party City Corp. directly paid the landlord, Royal Bank, and the vendors for outstanding debts. Therefore, Nasuti argues, to allow these claims in this case would constitute double recovery. In essence, Nasuti contends that "a plaintiff may obtain judgment against several [defendants] for the same harm, [however] he or she is only entitled to one satisfaction of that harm." *Brandt v. Eagle,* 412 Pa.Super. 171, 602 A.2d 1364, 1367 (1992) (en banc), *app. denied,* 532 Pa. 653, 615 A.2d 1310.

Plaintiffs reply that they are not seeking "double recovery" from Party City Corp. and Nasuti, but that Party City Corp. merely agreed to pay the amount of the settlement directly to the creditors rather than to them, in satisfaction of the debts owed by the

McDermotts and Nasuti collectively as part of the McDermott Group. (Ex. P–38.)

The direct payment by Party City Corp. of the debts of the McDermott Group did not affect Nasuti's duties to the McDermotts. The two are completely unrelated. The McDermotts and Party City Corp. structured the settlement inter se in a manner that Party City Corp. was to pay the amounts owing directly to the creditors, rather than having Party City Corp. pay the McDermotts who would, in turn, pay the creditors. This undoubtedly was done to accommodate Party City Corp.'s concern that it not be subjected to potential liability by third parties in the event that the McDermotts did not pay the creditors with the monies received from the Party City Corp. settlement. In any event, the McDermotts, albeit through payment by Party City Corp. rather than directly, extinguished 100 percent of the debts owed by the McDermott Group to creditors. Because under the Shareholder Agreement, Nasuti must pay 51 percent of the McDermott Group debt, the Court will uphold this portion of the jury award.

 c. Unforeseeable damages—the sale of the mutual funds

█ Nasuti also contends that the jury's award of $17,500 for the tax and opportunity losses associated with the early liquidation of the McDermotts' mutual funds to secure the repayment of the loan to Royal Bank was improper. Plaintiffs disagree, arguing that because Nasuti was provided all of the Royal Bank loan documents, including those indicating that the McDermotts had pledged the mutual funds as security, Nasuti could have reasonably foreseen that the mutual funds would have to be liquidated if he breached the stock purchase agreement.

The Court disagrees with plaintiff's theory of foreseeability. As discussed above, foreseeability is to be determined at the point in time when the contract was formed and not at the time the contract was breached, i.e. were the consequences reasonably contemplated by the parties at the time the agree-

ment was made, not when it was broken. Plaintiffs claim that Nasuti knew that the mutual funds were pledged as security and, thus, that fact was within the contemplation of the parties at the time the agreement was entered. Mere knowledge of one of the parties of a special situation, however, is not sufficient:

> 'Parties, when they enter into contracts, may well be presumed to contemplate the ordinary and natural incidences and consequences of performance or non-performance; but they are not supposed to know the condition of each other's affairs, nor to take into consideration any existing or contemplated transactions not communicated or known, with other persons. Few persons would enter into contracts of any considerable extent as to subject matter or time if they should thereby incidentally assume responsibility of carrying out, or be legally held affected by other arrangement over which they have no control.'

*Ebasco*, 460 F.Supp. at 217 (quoting *Macchia v. Megow*, 355 Pa. 565, 50 A.2d 314, 316 (1947) (quoting Sutherland on Damages § 47(4th ed.))).

The claim for tax and opportunity losses is thus not compensable. As Jeffery McDermott testified at trial, the mutual funds were not liquidated by Royal Bank, but rather they were sold by the McDermotts to raise cash to pay the Royal Bank debt because they had no other liquid assets to draw from. (Tr. 8/25/97 at 227.) Therefore, the sale of the mutual funds did not flow directly from the breach of the contract, but rather was the result of the McDermotts' precarious financial situation at the time that the loan was called.[17]

Therefore, the Court will affirm the jury's award of contract damages in all respects except to reduce by $17,500 for the liquidation of the mutual funds, resulting in a reduced recovery under the contract claim of $358,989.49.

---

17. Nasuti is no more responsible for the tax and lost opportunity costs associated with the voluntary sale of the mutual funds than he would be for future appreciation of the McDermott's two homes, which were also pledged as security for the transaction, if the McDermotts had chosen to sell these houses rather than the mutual funds to raise cash to pay the debt.

## B. *Tort*

### 1. Liability

 Plaintiffs allege that through self-dealing, including writing checks to himself from a McDermott Group account, transferring store inventory and personnel to his own Party City stores, usurping corporate opportunities, and then abandoning the store without adequate notice, Nasuti converted McDermott Group property and breached a fiduciary duty he owed the McDermott Group. Nasuti challenges the jury's verdict for plaintiffs on the breach of fiduciary duty claim, arguing that he did not owe them a duty as a fiduciary, and that even if did, he never breached that duty. In disputing the contention that there existed a fiduciary relationship between him and plaintiffs, Nasuti argues that the relationship between the parties was defined by a written contract, negotiated at arms-length between sophisticated parties, and that therefore no fiduciary duty was established. Moreover, even if there were a duty, there was insufficient evidence to support a finding that there was a breach of any duty owed to plaintiffs by Nasuti.[18]

Plaintiffs respond, to the contrary, that the evidence overwhelmingly supports the conclusion that plaintiffs placed their trust in the skill and experience of Nasuti and Brand, who had many years experience in the retail goods business and who owned and managed several apparently successful Party City stores. Further, plaintiffs contend that the Shareholder Agreement, which delegates management responsibilities to Nasuti, expressly designated Nasuti as their agent. Therefore, they argue, Nasuti, as the McDermott Group's agent, owed it "the utmost duties of loyalty and good faith toward the McDermotts with respect to the operation of the franchise." Pls.' Mem. at 22.

 Under Pennsylvania law, "[a fiduciary] relationship exists where one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on one side or weakness, dependence or justifiable trust, on the other." *Commonwealth Dept. of Transp. v. E–Z Parks*, Inc. 153 Pa. Cmwlth. 258, 620 A.2d 712, 717 (1993). "A business association may be the basis of a confidential relationship 'only if one party surrenders substantial control over some portion of his [or her] affairs to the other.'" *Id.* (quoting *In re Scott's Estate*, 455 Pa. 429, 316 A.2d 883, 886 (1974)). Further, when a person authorizes another to act as his or her agent, the relationship between the two may be characterized as a fiduciary relationship. *Sutliff v. Sutliff*, 515 Pa. 393, 528 A.2d 1318, 1323 (1987) (citing *Restatement (Second) of Agency* § 387 (1958)[19]; *Sylvester v. Beck*, 406 Pa. 607, 178 A.2d 755 (1962)); *Garbish v. Malvern Fed. Sav. & Loan Ass'n*, 358 Pa.Super. 282, 517 A.2d 547, 553–54 (1986). *See also In re Shahan*, 429 Pa.Super. 91, 631 A.2d 1298, 1303 (1993). "Under Pennsylva-

---

**18.** Nasuti contends that the evidence presented to the jury to prove plaintiffs' claim for conversion must be disregarded in evaluating plaintiffs claim for breach of fiduciary duty, because the jury did not find for plaintiffs on the conversion claim. The Court disagrees. Claims for breach of fiduciary duty and conversion are distinct and have separate and discrete elements. The elements the plaintiff must prove in claim of breach of fiduciary duty are: "(1) that the defendant negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which he or she was employed; (2) that the plaintiff suffered injury; and (3) that the agent's failure to act solely for the plaintiff's benefit ... was a real factor in bring about plaintiff's injuries," Pa. S.S.J.I. § 4.16 (1991). The elements of conversion are: (1) the deprivation of another's right of property in, or use or possession of, a chattel; (2) without the owner's consent; and (3) without lawful justification. *See Bernhardt v. Needleman*, 705 A.2d 875, 878

(1997). *See also Universal Premium Acceptance Corp. v. York Bank and Trust Co.*, 69 F.3d 695, 704 (3d Cir.1995) (citing *Cenna v. United States*, 402 F.2d 168, 170 (3d Cir.1968)).

While a plaintiff may not recover twice based on the same evidence on alternative theories, *Trackers Raceway, Inc. v. Comstock Agency, Inc.*, 400 Pa.Super. 432, 583 A.2d 1193, 1196 (1990), it does not follow that plaintiffs who proceeds on alternative theories based on the same type of evidence, cannot recover on one theory, i.e., breach of fiduciary duty, because the jury did not find for plaintiffs on the alternative theory, i.e., conversion.

**19.** The Restatement provides that "[u]nless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency." *Restatement (Second) of Agency* § 387 (1958).

nia law, the duty of an agent to his principal is one of loyalty in all matters affecting the subject of his agency and 'the agent must act with the utmost good faith in the furtherance and advancement of the interests of his principal.'" *Garbish,* 517 A.2d at 553–54 (quoting *Sylvester v. Beck,* 406 Pa. 607, 178 A.2d 755 (1962)). Because the terms of the agency relationship are spelled out in a written agreement, it does not mean that the agent does not also owe, as a matter of law, a duty of loyalty to the principal. In other words, the contract between the parties may serve to inform and define the agent's fiduciary duty imposed by law. Thus, for example, an agent who embezzles from his principal may be in breach of both the contract between the parties which spelled out his authority and functions, as well as the agent's duty imposed by operation of law.

As explained above, the evidence presented at trial was sufficient to support a finding that Nasuti assumed management and control of the store on behalf of the McDermott Group. After Donna and Jeffrey McDermott moved to Virginia, they entrusted Nasuti, whom they had selected by virtue of his management expertise, to manage the day-to-day operation of the McDermott Group business. The evidence showed that Nasuti acted as the McDermott Group's agent, making almost all the business decisions, and exercising full discretion on behalf of the McDermott Group for purchasing, inventory, payroll, personnel management, and negotiations with Party City Corp. and outside vendors.

Further, plaintiffs offered evidence that Nasuti opened a checking account in New Jersey, the location of Nasuti's management company, in the name of "Party City King of Prussia." (Tr. 8/21/97 at 79–81). Nasuti wrote checks to himself drawn on this account, which held funds from the McDermott Group store. The McDermotts, who had no signature authority on the account, *id.,* did not learn of its existence until after Nasuti repudiated the agreement and abandoned his management duties at the McDermott Group store, *(id.;* Tr. 8/25/97 at 63–64). Specifically, Nasuti wrote a check to his personal attorney on October 11, 1994 for $2,900. (Ex. P–27.) On March 6, 1995, Nasuti wrote a check to himself for $10,000, one week before he "canceled the contract" purportedly because the McDermotts failed to put more cash into the business. (Ex. P–22.) Even after Nasuti's repudiation of the contract, he wrote several checks payable to himself on this account, including, one on March 23, 1995 for $2,000, (Ex. P–23), one on March 27, 1995, for $1,000, (Ex. P–24), and one on March 30, 1995 for $3,000, (Ex. P–21).

Nasuti also transferred the McDermott Group's store manager, Tom Volpini, to other Party City stores owned by Nasuti and his affiliates. Plaintiffs paid Volpini's salary, which Brand reduced from $48,000 per year to $32,000 per year, (Tr. 8/22/97 at 40), from the McDermott Group account while Volpini was working for Nasuti at his other stores for approximately three months. (Tr. 8/25/97 at 164, 171–72.)

Plaintiffs also offered evidence, in the form of Party City "Inter Store Transfer" sheets, that showed that Nasuti transferred $15,-747.61 worth of inventory from the store to other stores, including stores he owned, without reimbursing the McDermott Group. (Ex. P–66; Tr. 8/25/97 at 77).

Further, plaintiffs offered evidence that Nasuti acted in his own interest when he suggested to the McDermotts that they relocate the McDermott Group store to the Northeast Shopping Center location, while in the meantime, unbeknownst to plaintiffs, Nasuti was planning to open his own Party City store approximately three miles away at the Cottman and Bustleton Avenues location.[20]

Lastly, plaintiffs offered evidence that Nasuti "cancel[ed] the contract" without notice and abruptly left the store. Based upon the evidence that Nasuti failed to provide sufficient notice to allow the McDermott Group to make alternative arrangements, and not making any efforts to keep the business via-

---

**20.** Plaintiffs further argue that Nasuti would benefit if he alone had both the Cottman and Bustleton and Northeast Shopping Center stores, regardless of their proximity, because he would, inter alia, be able to transfer inventory and employees and cross-refer customers, and thus a synergy between the stores would develop.

ble during the transition following his departure, the jury could have reasonably concluded that Nasuti put his interests ahead of the interests of the McDermotts.

In summary, the jury had sufficient evidence to reasonably conclude that Nasuti, as a fiduciary, owed plaintiffs the utmost duties of loyalty and good faith. Further, plaintiffs offered sufficient evidence for a reasonable jury to find, that through self-dealing, Nasuti breached these duties.

### 2. Damages

#### a. Compensatory damages

Nasuti argues that even assuming there was a breach of fiduciary duty, there was no evidence to support an award of damages. Plaintiffs respond that the $137,000 that the jury awarded them was adequately based upon evidence that: (1) Nasuti had paid himself from McDermott Group accounts in the amount of $18,790; (2) Nasuti had transferred inventory to his other stores for which he paid with McDermott Group funds in the amount of $15,747.61; (3) Nasuti took other inventory for which there was no records of inter-store transfers; (4) Nasuti transferred McDermott Group Store Manager Tom Volpini to Nasuti's other Party City stores while Volpini was being paid wages by the McDermott Group ($8,000, representing three months at a salary of $32,000 per year); and (5) plaintiffs were deprived profits when Nasuti impeded the relocation of the store from King of Prussia to the Northeast Shopping Center location through his self dealing.

Nasuti also contends, that because the jury did not find for plaintiffs on the conversion claim, it would be inconsistent, and thus impermissible to award plaintiffs damages on the breach of fiduciary duty claim, and that because the jury did not award plaintiffs damages for lost profits under contract theory, they could not do so under this tort claim.

■■■■■ Generally in tort claims, "a tortfeasor is liable for all the damages which ordinarily and in the natural course of things have resulted from the commission of the tort." *Frank v. Volkswagenwerk, A.G. of West Germany*, 522 F.2d 321, 323 (3d Cir.1975)(citing *Hillsdale Coal & Coke Co. v. Pennsylvania R.R. Co.*, 229 Pa. 61, 78 A. 28 (1910)). Damages must be proven with reasonable certainty. *Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa.Super. 90, 464 A.2d 1243, 1257 (1983)(internal citations omitted). While mathematical certainty is not required, the plaintiff must introduce sufficient facts upon which the jury can determine the amount of damages without conjecture. *Id.*

■■■■ As described above, plaintiffs presented evidence that Nasuti wrote checks to himself drawn on McDermott Group accounts, three of which he wrote even after he purportedly had repudiated the agreement. Testimony was offered that Nasuti assigned Tom Volpini, whose salary was reduced from $48,000 per year to $32,000 per year, to stores owned by Nasuti for three months and that Volpini was paid from McDermott Group funds. There was also evidence in the form of a list of inter-store transfers, including the invoice number, the inventory's origin, its destination, and the value of the transfer, that Nasuti transferred McDermott Group inventory to his own stores.[21] (Ex. P–66; Tr. 8/25/97 at 77). The jury, therefore, had sufficient evidence upon which to award plaintiffs $42,537.61 for the losses of these items.

■■■■ The $94,462.39 constituting the balance of the award, however, is not supported by the evidence. Plaintiffs argue that the jury may have awarded this amount to compensate them for the inventory that was missing upon physical inspection of the stock for which there was no transfer sheets, and/or, the profits lost by being prevented from continuing to operate the store at the Northeast Shopping Center.

---

**21.** For the reasons explained above, there is no reason why plaintiff should be barred from recovering for the damages suffered from the loss of injury because the jury did not find for plaintiffs on the conversion claim. "Relief in the alternative or of several different types may be demanded." Fed.R.Civ.P. (8)(a). Therefore, when a plaintiff proceeds on alternative theories, a plaintiff is not precluded from recovering on one theory because the jury did not find for him or her on both.

Plaintiffs offer the testimony of Stephen Cucinotti, an experienced liquidator, who had been hired by the McDermotts to liquidate the store. Cucinotti testified at trial that when he compared the computer-generated inventory sheets to the store's physical inventory, he found "significant discrepancies," i.e. where there should have been ten items according to the inventory sheets, upon physical inspection, only one or two were found. (Tr. 8/22/97 at 65.) Neither Cucinotti's testimony, nor the computer generated "Inventory Valuation Summary Report" (Ex. D–145) he referred to in his testimony, were specific enough to justify the jury's award. Further, Cucinotti did not testify that he calculated the amount of the inventory missing. The inventory valuation summary report only lists total values for the inventory that was supposed to have existed in each store department. The Court concludes that because it would be impossible to reach a fair estimate of the amount of inventory lost based on Cucinotti's testimony and the supporting document, the evidence was not sufficient to support the jury's award without conjecture. The Court therefore will not uphold that aspect of the jury's award on this basis.

Alternatively, plaintiffs further that they were entitled to the profits the McDermott store could have made if plaintiffs were not forced to liquidated the franchise by Nasuti's breach. Lost profits for a new business, however, are generally not recoverable because "such damages are by nature speculative and elude a reasonable certain estimation." *Tannen*, 901 F.Supp. 932. In other words, because a new business, by definition, has not track record of earnings, projecting future profits is a hazardous undertaking. Plaintiffs did not adduce proofs which would allow the award on this basis. Because, damages on this theory, are speculative, at best, and because no proof of lost profits was presented no reasonable jury could award damages for lost profits in this case.

For these reasons, the Court must reduce the jury's award on the breach of fiduciary duty claim by $94,462.39, from $137,000 to $42,537.61.

### b. Punitive damages

Nasuti argues that the jury's punitive damage award was not supported by the evidence, and that because it was nearly three times the amount of compensatory damages awarded, is excessive, and thus must be reduced. Nasuti further argues that the loss to plaintiffs was purely economic, and Nasuti's actions were not outrageous or reprehensible so as to justify the punitive damage award.

Plaintiffs respond that the size of the award was appropriate because a lesser amount would not deter someone of Nasuti's wealth from taking similar actions, and thus would defeat one of the purposes for punitive damages, to punish the wrongdoer for committing the improper act and to deter others for committing such an act in the future. *Restatement (Second) of Torts* § 908 (1977); *In re TMI*, 67 F.3d 1119 (3d Cir.1995); *Kirkbride v. Lisbon Contractors, Inc.*, 521 Pa. 97, 555 A.2d 800, 803 (1989).

### i. Nasuti's actions were sufficiently outrageous to support an award of punitive damages.

 Under Pennsylvania law, the decision of whether to award punitive damages and the scope of the damages are within the discretion of the finder of fact.[22] *Donaldson v. Bernstein*, 104 F.3d 547, 556–57 (3d Cir. 1997) (applying Pennsylvania law). "Punitive damages are appropriate when the act committed, in addition to causing actual damages, constitutes 'outrageous conduct,' either through reckless indifference or bad motive." *Id.* (citing *McClellan v. Health Maintenance Organization of Pennsylvania*, 413 Pa.Super. 128, 604 A.2d 1053, 1061 (1992) and *Feld v. Merriam*, 485 A.2d 742, 747–48 (1984) (adopting *Restatement (Second) of Torts* § 908(2)in Pennsylvania)). Outrageous conduct "is defined as an act which, in addition to creating 'actual damages, also imports insult or outrage, and is committed with a view to oppress or is done in contempt of plaintiffs' rights.'" *Klinger v. State Farm Mut. Auto.*

---

**22.** The standard of proof for punitive damages under Pennsylvania law is by a preponderance of the evidence. *Sprague v. Walter*, 441 Pa.Super.

1, 656 A.2d 890, 923 (1995) (citing *DiSalle v. P.G. Pub. Co.*, 375 Pa.Super. 510, 544 A.2d 1345, 1372 (1988)).

*Ins. Co.,* 115 F.3d 230, 235 (3d Cir.1997) (quoting *Delahanty,* 464 A.2d at 1263). To determine whether punitive damages are appropriate the following factors may be considered: (1) the character of the act; (2) the nature and extent of the harm caused; and (3) the wealth of the defendant. *Kirkbride,* 555 A.2d at 803 (citing *Restatement (Second) of Torts* § 908(2) (1978)). Further, in making the determination, "one must look to the act itself together with all the circumstances including the motive of the wrongdoers and the relations between the parties. . . . The state of mind of the actor is vital. The act, or the failure to act, must be intentional, reckless or malicious." *Feld v. Merriam,* 506 Pa. 383, 485 A.2d 742, 747–48 (1984), *quoted by UGI Corp. v. Piccione,* No. 88–1125, 1997 WL 698011, *8 (E.D.Pa. Nov. 5, 1997). Moreover, under Pennsylvania law, to award punitive damages there must be conduct beyond that which supported the compensatory damages award. *Donaldson,* 104 F.3d at 557 (citing *Smith v. Renaut,* 387 Pa.Super. 299, 564 A.2d 188, 193–94 (1989)). In other words, because the award of punitive damages is intended to satisfy a public policy purpose beyond compensation to the injured party, simply because the conduct of the tortfeasor is actionable and has caused damages, the injured party is not entitled to punitive damages. Further, a judge may not vacate a jury's punitive damages award because he or she might have awarded less. *Sprague v. Walter,* 441 Pa.Super. 1, 656 A.2d 890, 925 (1995).

 The jury's finding that plaintiffs had proven that Nasuti acted in an outrageous manner, that is he acted with intentional, reckless, or malicious disregard for plaintiffs' interests was supported by the evidence. Plaintiffs produced evidence that after Nasuti gained the McDermott's trust and confidence, he acted in his own interest, paying himself and his attorney from McDermott Group funds, taking inventory from the McDermott Group for use in his own stores, and assigning a McDermott Group employee to work in his store and paying him from McDermott Group funds. Even after Nasuti let the McDermotts know the Northeast Shopping Center location was available, he made the choice problematic by choosing to open his own store approximately three miles away. Once he decided to quit, Nasuti executed a quick exit, without prior notice, on the pretext that there was no contract between the parties. Thus, plaintiffs offered evidence that Nasuti left them "high and dry" to his own benefit. The jury, therefore, was within its discretion to find the conduct to have been intentional, reckless, or malicious.

 Before it may remit the damages, the Court must find that the jury's award "shocks the court's sense of justice." *Kirkbride,* 555 A.2d at 802–803. Considering the character of Nasuti's actions, the nature and extent of the harm caused by him, and in light of his wealth, there is nothing to indicate that the jury's award "shocks the conscience." Therefore, the Court has no basis to overturn the jury's award of punitive damages.

#### ii. The award was not unconstitutionally excessive.

Nasuti contends that the jury's award of $375,000 is impermissibly excessive when compared to the $137,000 the jury awarded in compensatory damages. Nasuti relies on the recent United States Supreme Court case of *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), for the proposition that a punitive damage award that is "grossly excessive" violates the constitutional right to due process, and is, therefore, impermissible. In response, plaintiffs argue that Nasuti's reliance on *BMW* is inappropriate in this particular case, because in *BMW,* the punitive damages awarded were 500 times the amount of compensatory damages awarded, while in this case the ratio is only 3 to 1.

 The Court must decide whether the award was excessive under either or both Pennsylvania or federal law. First, the Pennsylvania Supreme Court has held that under Pennsylvania law there is no proportionality required between the amount of consequential damages and the amount of punitive damages awarded. *Kirkbride v. Lisbon Contractors, Inc.,* 521 Pa. 97, 555 A.2d 800 (Pa.1989). The Pennsylvania Supe-

rior Court explained the rationale of the *Kirkbride* decision thus:

> Under Pennsylvania law, punitive damages need bear no proportional relationship to the compensatory damages awarded in a particular case. Rather, a reasonable relationship must exist between the amount of the punitive damage award and the twin goals of punishment and deterrence, the character of the tortious act, the nature and extent of the harm suffered by the plaintiff, and the wealth of the defendant. Our Supreme Court has ruled that a mathematical proportionality requirement between punitive and compensatory damages would actually defeat the purpose of punitive damages, which is to punish tortfeasors for outrageous conduct and deter them and others from similar conduct.

*Sprague*, 656 A.2d at 925 (citing *Kirkbride*, 555 A.2d at 803–804). While "mathematical certainty" is not required, *Delahanty*, 464 A.2d at 1257, "a reasonable relationship must still exist between the nature of the cause of action underlying the compensatory award and the decision to grant punitive damages." *Sprague*, 656 A.2d at 925. Further, the wealth of the defendant is an appropriate factor for the finder of fact to consider. *Sprague*, 656 A.2d at 925 (citing *Kirkbride*, 555 A.2d at 803).

Finding no defect in the jury's award under Pennsylvania law, the Court must turn to the question of whether the punitive damage award was so excessive as to violate due process under federal law. The United States Supreme Court, in *BMW*, explained that "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice nor only of the conduct that will subject him to punishment but also of the severity of the penalty a state may impose," *BMW*, 116 S.Ct. at 1598. The Supreme Court set forth three "guideposts" to aid in the determination whether a particular punitive damage award is "grossly excessive," and therefore violates due process. *Id.* These guideposts are: (1) the degree of reprehensibility of defendant's conduct, (2) the ratio of the punitive damage award to the actual harm inflicted on the plaintiff, and (3) a comparison of civil and criminal sanctions for comparable conduct. *Id.* at 1599–1603.

 Nasuti argues that the evidence did not support the jury's finding that his actions were sufficiently reprehensible to justify an award of punitive damages. According to the Supreme Court, this factor is "the most important indicium of the reasonableness of a punitive damages award ....", and trickery or deceit are considered indicative of reprehensible conduct. *Id.*, at 1599.

In this case, jury found that Nasuti breached the fiduciary duty he owed the McDermotts. While the McDermotts were sophisticated in terms of their knowledge and experience in business generally, they retained Nasuti precisely because of his recognized knowledge and expertise in the party goods industry. Having thus obtained the confidence of the McDermotts, Nasuti proceeded to operate for his own benefit without regard to the McDermott's interests. Once detection of Nasuti's perfidy became inevitable because of the poor performance of the store, Nasuti fabricated a pretext that there had never been any contract. Therefore, the jury was entitled to conclude that, having been anointed by the McDermotts as "captain of their [business] ship," Nasuti abandoned it, without notice and in the middle of a financial storm, under the thinly veiled pretext that there had never been a contract at all.

Nasuti further argues that the amount of punitive damages awarded was out of proportion to the actual loss caused by the breach. However, in *BMW*, the Supreme Court rejected the notion that there exists "a mathematical bright line between constitutionally acceptable and constitutionally unacceptable that would fit every case." *Id.* at 1602 (quoting *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 458, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) and *Pacific Mutual Life Ins. Co. v. Haslip*, 499 U.S. 1, 18, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991)). Rather, the Supreme Court held that "[a] general concern of reasonableness ... properly enter[s] into the constitutional calculus." *Id.* Nor is Nasuti's argument that the punitive damage award be mathematically proportional to the compensatory damages

awarded consistent with Pennsylvania law.[23] *Kirkbride,* 555 A.2d at 803. In this case, the amount of the punitive award, $375,000, is less than nine times the reduced amount of compensatory damages under the tort claim, $42,537.61.

In *BMW,* the Supreme Court commented that "[i]n most cases, the ratio will be well within a constitutionally acceptable range, and remittitur will not be justified on this bases. When the ratio is a breathtaking 500 to 1, however, the award must surely 'raise a judicial eyebrow.'" *BMW,* 116 S.Ct. at 1603 (quoting *TXO,* 509 U.S. at 482, 113 S.Ct. 2711 (O'Connor, J., dissenting)). In *Haslip,* the Court concluded that a ratio of four to one did not "'cross the line into the area of constitutional impropriety.'" *BMW,* 116 S.Ct. at 1602 (quoting *Haslip,* 499 U.S. at 23–24, 111 S.Ct. 1032); and in *TXO* the Court suggested that even if a punitive damage award was as high as 10 times compensatory damage award, the due process clause would not be violated, *id.* Because the ratio in this case, 8 to 1, does not approach the ratios other courts have found to "raise a judicial eyebrow," or "'jar one's constitutional sensibilities,'" *TXO,* 509 U.S. at 462, 113 S.Ct. 2711 (quoting *Haslip,* 499 U.S. at 18, 111 S.Ct. 1032), 482, the Court concludes that the ratio in this case is not constitutionally impermissible.

Lastly, the Court must "compar[e] the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct ..." *BMW,* 116 S.Ct. at 1603. The Court concludes that this last test is satisfied because Nasuti's conduct could be considered criminal under Pennsylvania law, *see* Forgery and Fraudulent Practices, 18 Pa. Cons.Stat. ch. 41, and Theft by Deception, 18 Pa. Cons.Stat. § 3922, and could subject him to a term of incarceration and fines up to twice the amount he gained by his conduct. Further, under Pennsylvania law, fraudulent business practices are subject to civil penalties up to three times the actual damages sustained plus additional relief a court may deem proper and costs and fees. *See* 73 Pa. Stat. § 201–1 *et seq.*

·Upon consideration of the *BMW* guideposts, the Court concludes that the punitive damage award in this case is not "grossly excessive" and will permit the jury's award to stand.

### C. Prejudgment Interest

#### 1. Breach of contract

Prejudgment interest is a matter of right in breach of contract cases. *Spang & Co. v. USX Corp.,* 410 Pa.Super. 254, 599 A.2d 978, 983 (1991) (citing *Fernandez v. Levin,* 519 Pa. 375, 548 A.2d 1191, 1193 (1988)). "That right to interest begins at the time payment is withheld after it has been the duty of the debtor to make such payment." *Fernandez,* 548 A.2d at 1193. Under Pennsylvania law, unless otherwise specified by the parties, the rate of prejudgment interest is calculated as simple interest at a rate of six percent per year. Pa. Stat. Ann. tit. 41, § 202 (1991); *Spang,* 599 A.2d at 984.

---

**23.** In *Kirkbride,* the Pennsylvania Supreme Court held that:

If the purpose of punitive damages is to punish a tortfeasor for outrageous conduct and to deter him or others from similar conduct, then a requirement of proportionality defeats that purpose. It is for this reason that the wealth of the tortfeasor is relevant. In making its determination, the jury has the function of weighing the conduct of the tortfeasor against the amount of damages which would deter such future conduct. In performing this duty, the jury must weigh the intended harm against the tortfeasor's wealth. If we were to adopt [a theory of proportionality], outrageous conduct, which only by luck results in nominal damages, would not be deterred and the sole purpose of a punitive damage award would be frustrated. If the resulting punishment is rela-

tively small when compared to the potential reward of his actions, it might then be feasible for a tortfeasor to attempt the same outrageous conduct a second time. If the amount of punitive damages must bear a reasonable relationship to the injury suffered, then those damages probably would not serve as a deterrent. It becomes clear that requiring punitive damages to be reasonably related to compensatory damages would not only usurp the jury's function of weighing the factors set forth in Section 908 of the Restatement (Second) of Torts, but would also prohibit victims of malicious conduct, who fortuitously were not harmed, from deterring future attacks.

*Kirkbride,* 555 A.2d at 803 (quoted by *G.J.D. and D.K. by G.J.D. v. Johnson,* 447 Pa.Super. 340, 669 A.2d 378, 382 (1995)).

In this case, the Court has concluded that the jury's award of should be reduced to $358,-989.49. Of this amount, $56,409.49 was awarded as the purchase price of the stock and $302,580.00 was awarded for Nasuti's share (51 percent) of the landlord debt, the vendor debt, and the debt to Royal Bank. Thus, as to the landlord debt, the vendor debt, and the Royal Bank debt, plaintiffs are entitled to $44,660.81, representing six percent interest on $302,580.00 from the time the contract was breached, March 13, 1995, until the time judgement was entered, August 28, 1997 (2.46 years). As to the amount owed plaintiffs for the purchase price of the stock, the applicable rate of interest is governed by the terms of the Promissory Note. (Ex. P–10.) According to the Promissory Note, interest shall accrue at the prime rate. (Ex. P–10.) Plaintiffs, therefore, are entitled to $14,447.65 in prejudgment interest, representing interest at prime rate on $56,409.49 from August 30, 1994, the date the Promissory Note was executed, to August 28, 1997, the date of judgment. See Pls.' Mem. to Add Prejudgment Interest, Ex. B.

### 2. Breach of fiduciary duty

Generally, it is within the discretion of the Court to award prejudgment interest with regard to unliquidated sums, such as that for breach of fiduciary duty. See Ambromovage v. United Mine Workers of Am., 726 F.2d 972, 981 (3d Cir.1984); Sack v. Feinman, 489 Pa. 152, 413 A.2d 1059, 1063–65 (1980). Under Pennsylvania law, prejudgment interest is available for awards for breach of fiduciary duty. Sack, 413 A.2d at 1065 ("Whenever the defendant holds money or property that belongs in good conscience to the plaintiff, and the objective of the court is to force disgorgement of his unjust enrichment, interest upon the funds or property so held may be necessary to force complete restitution.") As discussed above, see supra at pp. 625–628, Nasuti breached the fiduciary duty he owed plaintiffs. Further, the Court calculated the damages awarded to plaintiffs by evaluating the evidence supporting specific amounts Nasuti improperly took from plaintiff. Therefore plaintiffs are entitled to $6,278.55, representing six percent simple interest per year on $42,537.61 from the time

the duty was breached until the date of judgement.

In this case, the jury found that Nasuti breached a contract with, and fiduciary duty owed to, plaintiffs. Further, Nasuti has failed to provide any specific reason why it would be inequitable to award prejudgment interest on plaintiffs' award. The Court, therefore, will add $65,387.01 in prejudgment interest to the total amount awarded plaintiffs.

### IV. CONCLUSION

For the reasons stated above, the Court will vacate the jury award for the breach of contract and enter an amended judgment in favor of plaintiffs for $841,914.11, representing $776,527.10 in the principal award and $65,387.01 in prejudgment interest.

An appropriate order follows.

### ORDER

**AND NOW**, this 30th day of **June, 1998**, upon consideration of defendant's motion for judgment as a matter of law, or in the alternative for a new trial (doc. no. 136), plaintiffs' responses (doc. nos. 137, 139), and defendant's reply (doc. no. 138), plaintiffs' motion to amend judgment to add prejudgment interest (doc. no. 114), defendant's response (doc. no. 117), after oral argument, and for the reasons stated in the Memorandum accompanying this Order, it is hereby **ORDERED** as follows:

1. As to docket no. 116–1, defendant's motion for judgment as a matter of law is **GRANTED IN PART and DENIED IN PART;**

2. As to docket no. 116–3, defendant's motion for a new trial is **DENIED;**

3. As to docket no. 116–2, defendant's motion for remittitur is **DENIED;**

4. As to docket no. 114, plaintiff's motion for prejudgment interest is **GRANTED;** and

5. An **AMENDED JUDGMENT** shall be **ENTERED** in favor of plaintiffs and against defendant in the amount of $841,914.11.

**AND IT IS SO ORDERED.**