**TOTAL CONTROL, INC., Plaintiff,**

v.

**DANAHER CORPORATION,
et al. Defendants.**

No. Civ.A. 02–CV–668.

United States District Court,
E.D. Pennsylvania.

March 1, 2005.

Barbara H. Kramer, Mitchell A. Kramer & Associates, Mitchell A. Kramer, Kramer & Kramer, LLP, Rydal, PA, for Plaintiff.

Herbert I. Rothbart, Chicago, IL, Michael J. Torchia, Stephen C. Goldblum, Semanoff, Ormsby, Greenberg & Torchia LLC, Jenkintown, PA, for Defendants.

## MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

### I. Introduction

In this breach of contract action, the jury returned a verdict in favor of plaintiff Total Control, Inc. ("Total Control") in the amount of $1,485,061. Defendant Danaher Corporation ("Danaher") now brings this motion to amend the judgment or in the alternative for a new trial. For the reasons that follow, I will deny the motion in its entirety.

### II. Background[1]

Danaher and its related companies manufacture digital equipment and controls.[2]

---

1. I accept the facts in the light most favorable to the verdict winner. *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1097 n. 6 (3d Cir.1995).

2. As has been the convention of the parties and the Court throughout the litigation, I will refer to each and all of the defendants as "Danaher," regardless of which particular corporate entity is at issue, unless, of course,

*Total Control, Inc. v. Danaher Corp.*, 324 F.Supp.2d at 658, 659 (E.D.Pa.2004). On June 30, 1986, Total Control entered into an Agency Agreement (the "Agreement") with Dyanapar Corporation ("Dynapar"), a predecessor entity to Danaher, whereby Dynapar appointed Total Control as its exclusive sales agent for digital equipment and controls in a territory comprising Eastern Pennsylvania, Maryland, Southern New Jersey, and the District of Columbia, as well as for certain of Dynapar's accounts in Virginia. (Def.'s Trial Ex. 2.) On February 21, 1991, an amendment to the Agreement augmented the products that Total Control represented to include products that were sold by the Veeder–Root Digital Products Group in 1991 and were merged into the Dynapar product line.[3]

Generally speaking, Danaher uses a hierarchical classification system for its products. Each product has an item number. (Pl.'s Trial Ex. 22–F.) One or more types of products with distinct item numbers are sometimes grouped into different "Minor Groups." (*Id.*) A series of Minor Groups might, in turn, be grouped under one of several brand names carried over from acquisitions of the Danaher parent company. (Pl.'s Trial Ex. 22–J.) "Veeder–Root," "Partlow West," and "Northstar" are examples of brand names falling within the Danaher umbrella. (*Id.*) Other Minor Groups are grouped by functionality. (*Id.*) "Voting machines," "hub odometers," and "military instruments" are examples of these functional groupings.

As a sales agent or manufacturer's representative for Danaher, Total Control's role was directed more towards cultivating a market for Danaher products in the region, rather than towards securing individual orders from clients and relaying those orders to Danaher. (Tr. Sept. 8, 2004, at 57:16–62:20.) Under the Agreement, therefore, Danaher paid commissions to Total Control for all sales of covered products in the region, including individual sales of which Total Control was often wholly unaware. (*Id.* at 62:23–64:8.) Payments of commissions were due to Total Control in part on a regular monthly basis and in part as sales were completed. (Def.'s Trial Ex. 2.)

The original Agreement provided that either party could cancel the Agreement without cause upon thirty days' advance written notice. (*Id.*) A December 13, 1998 letter from the Marketing Manager of Danaher to Steve Schultz ("Schultz"), the President of Total Control, amended the Agreement as follows:

> For 1989, we [Danaher] are extending the normal 30 day cancellation period from 30 days to 120 days. Furthermore, this 120 day provision shall remain a condition of your contract in subsequent years, conditional to your sales increasing by 10 percent over prior year sales. Should this not occur, then the contract would revert to normal 30 day terms.

(Pl.'s Trial Ex. 2.)

The parties operated under the Agreement, as modified on occasion and renewed annually, until Danaher terminated the Agreement, effective December 31, 2001. (Pl.'s Trial Ex. 9.) At the time of termination, Danaher owed Total Control commissions for sales made in Total Control's exclusive territory during the operation of the Agreement. Danaher also owed Total Control commissions for sales in Total

---

a distinction among entities is relevant to the discussion.

**3.** Veeder–Root was a company that Danaher acquired and merged with Dynapar to form Danaher Controls. (Tr. Sept. 8, 2004, at 76:22–24.)

Control's exclusive territory that occurred in the 90 days following the effective date of termination because Total Control's sales had increased by more than 10 percent over prior year sales and Danaher gave only 30 days notice of termination, rather than the 120 days required by the Agreement.

Total Control filed suit against Danaher on February 8, 2002. The complaint included four counts: 1) breach of contract; 2) tortious interference with business relationships; 3) violation of the Pennsylvania Commissioned Sales Representative Act, Pa. Stat. Ann. 43 § 1473 (2004) ("PCSRA"); and 4) unjust enrichment. (First Amend. Compl. ¶¶ 24–42.) Total Control later elected not to pursue the tortious interference and unjust enrichment claims, and I dismissed the PCSRA claim on summary judgment. *Total Control, Inc. v. Danaher Corp.*, 2004 WL 1878238, at *1 n. 1, 2004 U.S. Dist. LEXIS 16689, at *12 (E.D.Pa. Aug. 18, 2004).

A seven-day jury trial began on September 7, 2004.[4] At issue in the trial was whether Danaher breached its contract with Total Control by failing to pay commissions on seven categories of commissions: 1) Minor Group 2030 products; 2) Minor Group 8010 products; 3) voting machines; 4) vehicle products or hub odometers; 5) military instruments; 6) miscellaneous products that were either delivered or sold in Total Control's exclusive territory; and 7) ninety days of customary commissions that Total Control claimed as damages for Danaher's breach of the contractual notice period for termination. Total Control sought damages only for commissions due within the four years preceding the filing of its complaint. The jury returned a verdict in favor of Total Control and awarded damages in the amount of $1,485,061. (Civil Judgment Order.) That verdict reflected an award of damages in all categories of commissions except the sixth, miscellaneous products delivered or sold in Total Control's territory. (Tr. Sept. 15, 2004, at 14:23–16:20.)

### III. Legal Standard

Federal Rule of Civil Procedure 59(e), governing motions to alter or amend the judgment, simply provides that "[a]ny motion to alter or amend a judgment shall be filed no later than 10 days after entry of the judgment." Fed.R.Civ.P. 59(e). "A proper motion to alter or amend judgment 'must rely on one of three major grounds: (1) an intervening change in controlling law; (2) the availability of new evidence [not available previously]; [or] (3) the need to correct clear error [of law] or prevent manifest injustice.'" *North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir.1995) (citations omitted.)

The decision to grant a new trial is committed to the sound discretion of the trial court. *Wagner By Wagner v. Fair Acres Geriatric Center*, 49 F.3d 1002, 1017 (3d Cir.1995). A new trial may be granted even where judgment as a matter of law is inappropriate. *Id.* I may grant a new trial on any or all issues "in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed. R.Civ.P. 59(a); *Walton v. City of Philadelphia*, 1998 WL 633676, at *2, 1998 U.S. Dist. LEXIS 13139 (E.D.Pa. Aug. 17, 1998). Among these reasons are where

---

**4.** On September 1, 2004, Total Control initiated a separate action against Danaher. *Total Control, Inc. v. Danaher Corp.*, No. 04–CV–4151 (E.D.Pa. filed Sept. 1, 2004). In a separate opinion issued today, I grant Danaher's motion to dismiss the second action on grounds of claim preclusion.

the verdict is against the clear weight of the evidence, or the verdict is inconsistent and reflects confusion on the part of the jury. *Id.* A new trial on the basis that the verdict is against the weight of the evidence can be granted "only where a miscarriage of justice would result if the verdict were to stand." *Klein v. Hollings,* 992 F.2d 1285, 1290 (3d Cir.1993). A judge may not substitute his or her judgment for that of the jury. *Walton,* 1998 WL 633676, at *2, 1998 U.S. Dist. LEXIS 13139. Where the proffered basis for a new trial is trial error, the court's inquiry is twofold: the court "must first determine whether an error was made in the course of the trial, and then must determine whether that error was so prejudicial that refusal to grant a new trial would be inconsistent with substantial justice." *Farra v. Stanley–Bostitch, Inc.,* 838 F.Supp. 1021, 1026 (E.D.Pa.1993); *McDermott v. Party City Corp.,* 11 F.Supp.2d 612, 620 (E.D.Pa. 1998.)

## IV. Discussion

### A. Statute of Limitations

Danaher argues that I erred by denying its motion for judgment as a matter of law brought pursuant to Federal Rule of Civil Procedure 50. In the instant motion, Danaher renews its argument that all of plaintiff's claims, except for those stemming from defendant's breach of the contractual notice provision, are barred by Pennsylvania's four-year statute of limitations for contract actions. 42 Pa. Cons.Stat. Ann. § 5525 (West 2004). Danaher points to the trial testimony of Schultz, the president of Total Control, to show that Total Control was aware, as early as 1995 and no later than 1997, that Danaher was not paying Total Control commissions on sales of voting machines, military products, and vehicle products sold in Total Control's exclusive territory.

The parties agree that Pennsylvania's four-year statute of limitations for contract actions applies to plaintiff's claims. 42 Pa. Cons.Stat. Ann. § 5525 (West 2004). They also agree that under Pennsylvania law, the limitations period begins to run at the time the cause of action accrues. However, the parties disagree over the question of when Total Control's claims accrued.

■ Under Pennsylvania law, where a contract calls for periodic or installment payments, a separate and distinct cause of action accrues with each failure to make payment. *Van Sciver v. Van Sciver,* 337 Pa. 390, 12 A.2d 108, 110 (1940); *Bush v. Stowell,* 71 Pa. 208, 211–12 (1872); *American Motorists Ins. Co. v. Farmers Bank & Trust Co. of Hanover,* 435 Pa.Super. 54, 644 A.2d 1232, 1235 (1994); *Ritter v. Theodore Pendergrass Teddy Bear Productions, Inc.,* 356 Pa.Super. 422, 514 A.2d 930, 935 (1986); *Pennsylvania Tpk. Comm'n v. Atlantic Richfield Co.,* 31 Pa. Cmwlth. 212, 375 A.2d 890, 892 (1977); *Aetna Life Ins. Co. v. Moyer,* 113 F.2d 974 (3d Cir.1940); *Fresh Start Indus. v. ATX Telecomm. Services,* 295 F.Supp.2d 521, 525 (E.D.Pa.2003); *Franklin v. SKF USA, Inc.,* 126 F.Supp.2d 911, 931 (E.D.Pa.2000); *Refac Fin. Corp. v. Patlex Corp.,* 912 F.Supp. 159, 163 (E.D.Pa.1996); *William Sklaroff Design Assocs., Inc. v. Spinneybeck Enter., Inc.,* 1996 WL 557587, at *3, 1996 U.S. Dist. LEXIS 14329, at *8 (E.D.Pa. Sept. 30, 1996); *Quinn v. Wilmington Trust Co.,* 1992 WL 382338, at *1, 1992 U.S. Dist. LEXIS 19225, at *3 (E.D.Pa. Dec. 10, 1992); *see also* 9 *Arthur Linton Corbin, Corbin on Contracts* §§ 949, 951, 989 (Interim ed.1993); 31 *Samuel Williston, Williston on Contracts* §§ 79:17, 79:19 (4th ed.2004).

Danaher appears to argue that where the breaching party fails to make periodic payments due to a differing interpretation of the underlying agreement, then the non-

breaching party's cause of action accrues when he becomes aware of the differing contractual interpretation.[5] In the instant case, under Danaher's rule, the statute of limitations would have begun to run when Total Control was put on notice that Danaher interpreted the Agreement to exclude commissions on sales of voting machines, military products, and vehicle products. In other words, the act of interpreting the Agreement to exclude those products, once discovered by the plaintiff, was the breach triggering the statute of limitations; the failure to pay subsequent commissions on those products was only an inevitable consequence therefrom. Danaher asserts that the undisputed evidence shows that Total Control had actual notice of this interpretative breach no later than 1997, more than four years before Total Control brought suit.

Danaher does not point to any authority to support its distinction, but there is some support in other jurisdictions. For example, in *Air Transport Ass'n of America v. Lenkin*, 711 F.Supp. 25, 27 (D.D.C.1989), *aff'd on other grounds*, 899 F.2d 1265, 1266 (D.C.Cir.1990), the court ruled that the District of Columbia's twelve-year statute of limitations precluded a plaintiff's suit for breach of contract where the breach stemmed from defendant's interpretation of the underlying rental contract. In that case, the defendant had allegedly overcharged plaintiff for rental payments over a period of thirteen years. *Id.* at 26. The alleged overcharge stemmed necessarily from the defendant's interpretation of a particular provision of the contract. *Id.* The court found that the plaintiff's cause of action accrued with the first request for rental payment that "definitively expressed defendant's interpretation of [the provision.]" *Id.* at 27. The court distinguished the case from others applying the general rule governing suits based on nonpayment of installment obligations:

> The issue in [installment cases] is not one of interpretation, which would govern throughout the life of the contract, but one of a single limited breach. Thus, if a lease made it clear that a tenant must pay $300 each month in rent and the tenant refused to pay for three straight months, the landlord would have three separate causes of action. If there was a dispute about whether the lease required the tenant to pay $300 each month or $75 each week, however, there would be only one cause of action, which would accrue the first time the landlord demanded a weekly payment.

*Id.* The court concluded that "causes of action based on contract interpretation, as opposed to situations devoid of any interpretive questions such as nonpayment of installments, should be deemed to accrue on the date on which plaintiff becomes or should become aware of the parties differing interpretations." *Id.* at 28.

The *Lenkin* court's distinction[6] between "causes of action based on contract inter-

---

**5.** Danaher characterizes the breach as follows:

Mr Schultz claimed there was a contract term in dispute, i.e., whether his contract permitted him to sell and collect commissions on voting machines, military instruments and vehicle products that were being sold in his territory. When Defendants refused, and denied Plaintiff had a contractual right to sell and receive commissions on these products, the statute of limitations on

Plaintiff's cause of action for breach of contract began to run.

(Def.'s Brief Supp. Mot. Amend Judg. at 7.)

**6.** I note that nearly any contractual dispute that reaches court can be characterized alternatively as a simple breach of a contractual duty or as a matter of differing interpretation of what constitutes a party's duties under a contract. If the distinction exists at all in practice, it is a very fine one.

pretation" and "situations devoid of any interpretive questions" is not supported by, and indeed is inconsistent with, Pennsylvania law. *Id., Refac Fin. Corp.*, 912 F.Supp. at 163 ("Although [the *Lenkin* court's] reasoning is persuasive, there is no authority in Pennsylvania to support a similar finding here.") As stated earlier, the general rule, explicitly laid down by the Pennsylvania Supreme Court, is that a separate and distinct cause of action accrues for each payment as it becomes due. *See Van Sciver*, 12 A.2d at 110; *Bush*, 71 Pa. at 211–12. Several decisions illustrate that Pennsylvania law does not allow for Danaher's proposed distinction between causes of action for non-performance of installment obligations stemming from interpretation and those for simple non-performance.

In *Ritter*, the plaintiff alleged that the defendant had assumed a contractual obligation to pay semiannual royalty payments to the plaintiff. 514 A.2d at 935. This obligation allegedly first arose more than eight years before the plaintiff effectively brought suit against the defendant. *Id.* at 932–33. The defendant had failed to make a single royalty payment to the plaintiff over that period. *Id.* at 932. Under the reasoning of *Lenkin*, therefore, the plaintiff was on notice that the defendant was operating under a different interpretation of the contract, one under which the defendant had not assumed the obligation to pay royalty payments. Nevertheless, applying Pennsylvania's general rule that "where installment or periodic payments are owed, a separate and distinct cause of action accrues for each payment as it becomes due," the Pennsylvania Superior Court allowed the plaintiff to pursue her claim for payments that fell due within the statutory period. *Id.* at 935. *See also Pennsylvania Tpk. Comm'n*, 31 Pa.Cmwlth. at 216, 375 A.2d 890 ("[W]here the repeated and measurable invasion of a plaintiff's rights

occurs both outside the statutory period and also within it, the fact that some of the injury and damage occurred outside the statutory period does not affect the plaintiff's right to recover for the separate invasion of its rights which occurred within the period.") (quoting *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 377 F.2d 776, 795 (3d Cir.1967)).

Similarly, in *Refac Financial Corp.*, the plaintiff sued for back payments of royalties due under a patent licensing agreement. 912 F.Supp. at 160. The defendant had interpreted the agreement to allow it to make certain deductions from revenue before computing the royalties due to the plaintiff, and the plaintiff was aware of that interpretation more than six years before it brought suit. *Id.* at 163. Nevertheless, the district court, applying Pennsylvania law, allowed the plaintiff to seek recovery for installment obligations that fell due within the statutory period. *Id.* In so doing, the district court specifically rejected the *Lenkin* distinction between disputes in interpretation that implicate all installments and breaches of discrete installment payments as unsupported by Pennsylvania law. *Id.; see also William Sklaroff Design Assocs.*, 1996 WL 557587, at *8 (even though plaintiff knew of defendant's breach of obligation to pay royalties prior to the statutory period, plaintiff was not barred from recovering for those payments that fell due within the statutory period).

▮ The cases discussed above are, of course, not strictly binding on me. The reasoning of those cases, however, is consistent with the general rule that in cases of anticipatory repudiation, the non-breaching party may either opt to afford the repudiator an opportunity to recant and perform by awaiting performance, in which case the cause of action accrues and

the statute of limitation begins to run at the time performance is due, or may elect to place the repudiating party in breach immediately, in which case the accrual date of the cause of action and the triggering of the statute of limitations are accelerated from the time of performance to the date of such election. *Franconia Assoc. v. United States,* 536 U.S. 129, 143, 122 S.Ct. 1993, 153 L.Ed.2d 132 (2002) (citing *Restatement (Second) of Contracts* (1979)); *McCormick, v. Fidelity & Cas. Co. of New York,* 307 Pa. 434, 161 A. 532, 533 (1932); *Simon Wrecking Co. v. AIU Ins. Co.,* 2004 WL 3015309, at *7, 2004 U.S. Dist. LEXIS 26087 (E.D.Pa. Dec. 29, 2004). To the extent that the Pennsylvania Supreme Court has not already adopted the reasoning of *Ritter, Pennsylvania Turnpike Commission, Refac Financial Corp.,* and *William Sklaroff Design Assocs.,* I predict it will do so. In sum, a separate and distinct cause of action accrued as each

payment to Total Control came due. The jury only awarded damages based on payments that were due less than four years before Total Control filed suit. Therefore, Total Control's recovery is not barred by the statute of limitations.[7]

■ In the alternative, I find that a reasonable jury could have found that Total Control was not put on notice of Danaher's interpretation of the contract until after February 8, 1998, the start of the statutory period.[8] Danaher asserts that it is undisputed that Total Control became aware no later than 1997 that it was not receiving commissions on voting machines, vehicle products, and military products. While it is clear from the record that Total Control was aware in 1995 that it was not receiving commissions on voting machines, the same cannot be said for vehicle products and military products. (Tr. Sept. 9, 2004, at 91:13–15, 90:4–91:12, 92:9–13.)

---

7. The parties also spend some time in their briefs debating the "continuing contract" doctrine, which is inapplicable to the instant case. The continuing contract doctrine is an exception to the general rule governing the accrual of causes of action. It acts to extend the statutory period and allows plaintiffs to recover damages incurred prior to the statutory period. *Thorpe v. Schoenbrun,* 202 Pa.Super. 375, 195 A.2d 870 (1963); 31 *Samuel Williston, Williston on Contracts* § 79:21, at 361 (4th ed.2004). But Total Control does not seek damages for Danaher's failure to make installment payments more than four years prior to Total Control's lawsuit. As Total Control properly notes, cases declining to apply the continuing contract doctrine nevertheless allow the plaintiff to recover for the defendant's failure to make installment payments during the statutory period. *Franklin,* 126 F.Supp.2d at 931; *Refac Fin. Corp.,* 912 F.Supp. at 162; *see also American–Foreign Steamship Corp. v. United States,* 291 F.2d 598, 617 (2d Cir.1961) (Friendly, J., dissenting) ("The application of the statute of limitations to contracts where a promise is entitled to periodic performance is a troublesome question. The cases fall into two lines. One is illustrated by decisions that the statute runs

separately against each installment of a debt, as, for example, against each right to collect interest on bond coupons, or against each installment of salary under a contract of employment. On the other hand, if the contract calls for the payment of an entire sum for a specified overall performance, with the right to collect advance payments, as in the case of progress payments to a contractor, or payments to an attorney retained in connection with a single litigation, the obligee may safely wait until the entire sum is due and sue for that without fear of the statutory bar on the earlier installments.") (citations omitted). Total Control only seeks to recover for breaches of installment obligations falling due within the statutory period, and the continuing contract doctrine certainly does not preclude that recovery.

8. While Danaher does not argue otherwise, I note also that a reasonable jury could have found that there was no "outright repudiation" of the contract. *See Henglein v. Colt Indus. Operating Corp.,* 260 F.3d 201, 214 (3d Cir.2001). In addition, Danaher does not argue that the parties modified the Agreement to reflect Danaher's interpretation.

Schultz testified as follows with respect to voting machines:

Q: And you also knew that you weren't getting commissions on voting machines, isn't that correct?

A: Yes. As of 1995, I became aware of that.

(*Id.* at 91:13–15.) However, he was far more equivocal with respect to when he first learned that he was not receiving commissions on military products and vehicle products:

Q: Now, you knew years ago that you weren't getting commissions on military products, isn't that true?

A: Yes.

Q: And you knew because you talked to the company about it, isn't that right?

A: I had that conversation with Dick Lowry.

Q: Actually, the conversation was probably late '80s. Isn't that the right—about the right time frame, late '80s, maybe early '90s?

A: No, I think it was later, it was later than 1995.

Q: So—okay. So let's say it's—you said later than 1995?

A: Yes.

Q: Okay. So sometime between 1995 and what, a couple years from then, something like that?

A: Let's just say 1997.

Q: Okay. 1997.

A: I'm not testifying to that, but let's just say that.

Q: So in 1997, thereabouts—I understand you don't know the exact date—it was clear to you that you were not getting commissions on military instruments, isn't that right?

A: It was clear that Danaher had a group of products that they called military, but no.

Q: No, you weren't getting commissions on them.

A: That's correct.

Q: Right. And in 1997 or thereabouts, you also knew that you weren't getting commissions on military products, isn't that right? I'm sorry on hub odometers.

A: That's correct.

Q: Same conversations with Mr. Lowry, isn't that right?

A: Well, as I said before, I'm not sure exactly when I heard about the hub odometers. I just knew that we weren't getting commissions on those.

(*Id.* at 90: 4–21.) Counsel for Danaher wrapped up the testimony as follows:

Q: So as far back as 1997, you knew you weren't getting commissions on hub odometers, you knew you weren't getting commissions on military instruments, you knew you weren't getting commissions on voting machines, isn't that right?

A: Yes.

(*Id.* at 92: 9–13.) Danaher takes this last statement as undisputed evidence that Total Control was aware that it was not receiving commissions on all three groups of product in 1997. However, in the context of Schultz's complete testimony, a reasonable jury could have inferred that Schultz only meant that he became aware in 1997, or "thereabouts." And a reasonable jury could have made the additional inference that "thereabouts" 1997 includes February 8, 1998, the start of the statutory period.

And while it is undisputed that Total Control was aware in 1995 that it was not receiving commissions on voting machines, Danaher has not shown that Total Control was aware that Danaher was not paying voting machine commissions that were due to Total Control under the Agreement.

Critically, it is disputed that Total Control was aware that Danaher was selling voting machines in Total Control's exclusive territory. Schultz testified as follows with regard to voting machine sales in Total Control's territory:

A: Okay. On the list of customers there was an—an entry, a company called Shooptronics, and I didn't recognize who it was. So I called Dick Lowry and I asked him about it, and he told me that that's an error. It should not be on your—on your sheet. And that—

. . . . .

A: And that I took that to mean that it just wasn't a customer in my territory. Occasionally there would be a computer glitch somewhere.

And he also told me that—that's a sale of a—a voting machine. And I had told him that we're supposed to get credit for sales of everything. And that's the first time I heard about voting machines not being part of our jurisdiction.

Q: What, if any, understanding did you have about whether or not—about the market [f]or voting machines in your territory?

A: Well, I was under the impression that Danaher did not sell voting machines in my territory, and I never received any sales lead, or—or information that there was even a—a customer base or a potential market in our region. So as far as I knew, there were no sales, and there was no real potential for voting machine sales.

Q: In fact, was Danaher selling . . . voting machines to a lot of different customers in your territory?

A: They weren't selling voting machines to anybody in my territory. Now, later on, during the litigation, I found that Shooptronics was actually a customer in my territory, so backing up the answer today is, yes. If you would have asked me in 1998, or the year 2000, the answer would have been no.

(Tr. Sept. 8, 2004, at 121:21—123:1.) Thus, if relevant at all, Total Control's notice of Danaher's breach prior to the statutory period involved multiple questions of fact appropriate for jury determination and inappropriate for judgment as a matter of law. *See Urland v. Merrell–Dow Pharmaceuticals, Inc.,* 822 F.2d 1268, 1276 (3d Cir.1987) (emphasizing importance of jury's role in application of discovery rule).[9]

Therefore, Total Control's claims were not barred by the statute of limitations because a new claim accrued as each payment came due and Total Control sought recovery only for payments falling due within the four years prior to filing suit. Moreover, even under Danaher's theory, a reasonable jury could have found that Total Control was not on notice of Danaher's breach until after the start of the statutory period.

### B. Minor Group 2030

The jury awarded Total Control $599,970 in damages for unpaid commissions on sales of products in the category Minor Group 2030. Danaher now argues that it is entitled to a new trial on this issue because I improperly excluded certain evidence relating to that product group under Fed.R.Civ.P. 37(b)(2) and Fed.R.Evid. 403. In particular, I excluded documentary evidence showing that Minor

---

**9.** Danaher failed to request a jury instruction regarding notice to Total Control and did not object to the final instructions in this regard. (Tr. Sept. 14, 2004, at 3:7–12.) Therefore, Danaher waived its opportunity to argue that such an instruction would have been appropriate and cannot (and does not) now argue for a new trial on that basis.

Group 2030 consisted of any products other than products identified as C628 because Danaher had represented to Total Control in discovery that Minor Group 2030 consisted only of C628 products and because I had specifically ordered Danaher to identify the products sold in Total Control's territory. I also prohibited the testimony of Randy Fitzhugh, an employee of Danaher, in that regard. However, I ultimately allowed counsel for Danaher to argue to the jury, using exhibits admitted into evidence, that Total Control's president, Steven Schultz, could not have believed that Minor Group 2030 consisted only of C628 products.

The discovery process in this litigation was unusually acrimonious. Total Control served its first set of interrogatories and request for production of documents on Danaher on July 25, 2002. While there is some dispute over this, I accept, for purposes of argument, defendant's representation that on September 11, 2002, past the expiration of the thirty-day allotted period under Fed.R.Civ.P. 33(b) and 34(b), defendant requested and plaintiff granted an extension for defendant to respond by September 30, 2002. (Def.'s Mem. Opp. P.'s Amend. Mot. Compel Disc. at 3.) When defendant did not meet this revised deadline, plaintiff filed a motion to compel discovery. (Pl.'s Mot. Compel Disc.) However, on defendant's assurance that it would provide responses by October 28, 2002, plaintiff voluntarily withdrew the motion. (Pl.'s Withdrawal Mot. Compel Disc.) Defendant responded to plaintiff's interrogatories and requests for production of documents on October 28, 2002. (Pl.'s Mem. Supp. Amend. Mot. Compel at 2.) However, plaintiff did not find these documents and responses to be sufficient for a variety of reasons and filed an amended motion to compel discovery on November 4, 2002. (*Id.* at 2–3.)

I held a telephone conference on December 6, 2002 to discuss the outstanding discovery motion. My order of December 18, 2002, which was agreed to by counsel, grew out of that conference. (Order (Dec. 18, 2002); Tr. Dec. 6, 2004, at 21:5–17.) Relevant to the present dispute is the first paragraph of that order, which reads:

1. By December 20, 2002, defendant will produce to plaintiff, documents detailing all sales of all products at issue in this case sold into plaintiff's territory during the period from January 1, 1998 to the present, which documents will detail by whom each product was sold, what product was sold, the price of each product sold, the brand name of each product sold, and defendant's designation of each product as to whether it was "I" (Immature), "M" (Mature) or "S" (Parts);

(Order at 1–2 (Dec. 18, 2002).)

Defendant provided documents and an explanatory letter to plaintiff on December 20, 2002. (Pl.'s Mot. Sanctions Ex. 5.) Among the documents produced by defendant was a computer printout listing individual sales of products in plaintiff's territory, with most sales classified by minor group. The entries in some cases list an item number and description, but in other cases do not. (*See, e.g.*, Def.'s Ex. Rule 50: D2 at 2.)[10] However, plaintiff was once again dissatisfied with defendant's responses and wrote to defense counsel to highlight the perceived deficiencies on January 2, 2003. (Pl.'s Mot. Sanctions Ex. 7.) Among plaintiff's complaints was that the

---

**10.** The record does not specifically indicate that defendant turned this particular page of defendant's shipping reports over to plaintiff at this stage of the litigation. However, based on my familiarity with the case and the discovery disputes, I believe this page to be representative. (*See* Trial Ex. P–22(F); Tr. Sept. 13, 2004, at 71:7–22.)

computer printout contained blanks where the item numbers and descriptions should have been. (*Id.*) Plaintiff also believed that defendant had not adequately responded to certain interrogatories requesting that defendant identify selected products. (*Id.*)

Danaher provided a preliminary response by letter on January 10, 2003. (*Id.* Ex. 8.) Counsel for Danaher stated in relevant part:

> 3. . . .
>
> Defendant's responses to Interrogatories 7, 9, 11, and 13 are also accurate, that is, we have produced documents which identify the various products Plaintiff requested.
>
> .    .    .    .    .
>
> 6. The document package produced was a complete, unredacted computer run of information direct from our client's computer system. We will recheck the information, but believe, however, the information produced is all that is available.

(*Id.*) Danaher supplemented this response one week later by letter of January 10, 2003.[11] (*Id.* Ex. 11.) Danaher included with this response the Minor Group list, which is a multipage list describing each of

Danaher's many minor groups.[12] (Def.'s Mot. New Trial Ex. C.) This list is at the center of the present dispute. Danaher described the Minor Group list in its letter as follows:

> 5. "Minor Groups" index; 10 pages arranged numerically; 16 pages arranged by brand. On the sales records previously produced and produced today, the far right column is labeled "Minor Group." The Minor Group number indicates to which brand each product belongs. You can use the Minor Groups index to compare with the brand.

(Pl.'s Mot Sanctions Ex. 11.) The following excerpt is both representative of the Minor Group list and critical to the present dispute:

| [Pr]oduct Brand | Minor Group | Div Code | DESCRIPTION |
|---|---|---|---|
| [Pa]rtlow Brand | 7900 | 01 | TEMP CONTR SPARES/REPAIRS |
| | 7901 | 01 | 1000/76 |
| | 7902 | 01 | WEST PRODUCTS |
| . . .<br>[Ve]eder–Root Brand | 2002 | 01 | |
| . . . | | | |
| | 2030 | 01 | C628 |
| | 2034 | 01 | |
| | 2036 | 01 | MC2 |
| | 2037 | 01 | SERIES 7910, 7975 |
| | 2040 | 01 | MC6-00-0, MC6-0S-0 |

(Def.'s Mot. New Trial Ex. C at 13–14 (emphasis added).)

name or a product number identifiable through documents produced to Plaintiff, the quantity of products ordered, and the price of each product ordered.

(*Id.* at 1–2.) Thus, collectively, the December 18, 2002 Order and the August 11, 2003 Order clearly require the defendant to detail and identify products sold in Total Control's territory.

---

11. Total Control continued to be dissatisfied with Danaher's compliance with my Dec. 18, 2004 Order and ultimately filed a motion for sanctions on January 17, 2003. (Pl.'s Mot. Sanctions.) After a hearing on July 25, 2003, I denied the motion for sanctions but ordered Danaher to produce additional documents. (Order (Aug. 11, 2003).) In particular, I ordered that:

> 1. By August 11, 2003, Defendants will produce to Plaintiff, documents in hard copy and electronic format, detailing all orders placed from Plaintiff's territory during the period from January 1, 2001 through April 30, 2002. These documents will detail what customer ordered the product, the date the product was ordered, the identity of the product ordered, either by

12. The parties at oral argument and in their briefs operated under the assumption that the Minor Group list was produced responsive to my August 11, 2003 order. (Order (Aug. 11, 2003).) My review of the record reveals that it was produced at this earlier stage of the litigation.

Total Control relied on the Minor Group list, later termed "the Rosetta Stone" document, in concluding that Minor Group 2030 consisted solely of C628 products, which Danaher acknowledges are products for the sales of which Total Control was entitled to receive commissions. (Tr. Sept. 13, 2004, at 41:15—43:23; Def.'s Mem. Supp. Mot. New Trial at 18.) Total Control calculated its damages based on this conclusion and its expert relied on this in preparing his report. (Tr. Sept. 13, 2004, at 58:16–20, 71:10–13.)

At trial, however, Danaher sought to introduce evidence showing that Minor Group 2030 consisted of many products in addition to C628 products. (Def.'s Mem. Supp. Mot. New Trial at 17–18.) In particular, Danaher would have presented evidence purporting to show that the "vast majority of the Minor Group 2030 product sales were Partlow–West products," and that progressively smaller portions were Electronic Voting Machine warranty contracts, repairs, and Metuchen Printheads, on all of which, Danaher argues, Total Control was not entitled to receive commissions. (*Id.*)

Total Control objected to the introduction of this evidence because it was directly contradictory to what Danaher had represented to them in discovery via the Minor Group list. Counsel for Total Control argued that "if you look at the Minor Group list, [2030 is] listed as a Veeder Root product. It says right there, Minor Group 20/30, C–628, Veeder Root. Now they're saying, it's not Veeder Root, it's Partlow West. It's not C–628, it's C–628 and a billion other things...." (Tr. Sept. 13, 2004, at 59:3–8.) Danaher responded that the Minor Group list only provides a "general description of the Minor Groups in the categories." (*Id.* at 44:20–21.) Danaher's position was that it had produced a document that the company had used internally for accounting purposes, in compliance with the rules of discovery and with my orders, and that Danaher should not be punished for Total Control's failure to inquire into the meaning of the document. (*Id.* at 43:25—45:11.) Further, Danaher argued that it had produced additional documents from which Total Control, through a series of cross-referencing among various spreadsheet printouts, could have discerned that Minor Group 2030 included products other than C628. (Tr. Sept. 14, 2004, at 6–14.)

I ruled that Danaher had violated my discovery orders concerning identification of sales in the territory. (Tr. Sept. 13, 2004, at 56:24–25.) I found that Total Control had reasonably relied on Danaher's representation of Minor Group 2030 as consisting solely of C628. (Tr. Sept. 14, 2004, at 13:17–19.) I also found that Total Control had suffered prejudice due to this reliance, in that Total Control had prepared its damage calculations and expert report, and presented its evidence to the jury on the basis of that representation. (*Id.* at 14:6–12; Tr. Sept. 13, 2004, at 58:16–20, 71:10–13.) I therefore precluded Danaher, both as a sanction pursuant to Rule 37(b) and as a matter of equitable estoppel, from introducing evidence in direct contradiction to its prior representation to Total Control. (Tr. Sept. 13, 2004, at 56:24–57:1; 59:11–14.) However, I ultimately allowed Danaher to argue to the jury that Schultz could not have believed that he was entitled to commissions on the entirety of Minor Group 2030. (Tr. Sept. 14, 2004, at 14:14–19; 67:17–71:15.) In so doing, I permitted Danaher to use certain exhibits, as the exhibits were largely derived from the plaintiff's own exhibits that were already admitted into evidence. (*Id.*)

█ Danaher now argues my rulings were in error. However, upon review of the record, I find that my rulings were

justified. I twice ordered Danaher to detail or identify all sales in Total Control's exclusive territory. (Order (Aug. 11, 2003); Order (Dec. 18, 2002).) Many of the sales entries that Danaher produced do not list an item number or description, but do list a Minor Group. The Minor Group List is the only clear identification of Minor Group 2030 that Danaher provided to Total Control in the course of discovery. Danaher's proposed introduction of evidence showing that Minor Group 2030 included Partlow West brand products flatly contradicts the Minor Group List, which clearly indicates that Minor Group 2030 products were Veeder Root brand and lists different Minor Groups with respect to Partlow West. Moreover, counsel for Danaher specifically instructed Total Control that "[t]he Minor Group number indicates to which brand each product belongs. You [Total Control] can use the Minor Groups index to compare with the brand." (Pl.'s Mot. Sanctions Ex. 11.) Furthermore, the Minor Group List specifies C628 products as the only component of Minor Group 2030.

Danaher argued at trial and argues now that it was theoretically possible through a series of cross-references among various spreadsheets produced in discovery for Total Control to discern that Minor Group 2030 included products other than C628.[13] However, it was reasonable for Total Control to rely on Danaher's one clear identifying document, the Minor Group list. Total Control reasonably relied on Danaher's clear representation that Minor Group 2030 consisted only of Veeder Root brand products and only C628 products. In reliance on that representation, Total Control calculated its damages, commissioned an expert report, and presented that evidence to the jury. (Tr. Sept. 13, 2004, at 58:16–20, 71:10–13.) It would have prejudiced Total Control for Danaher to introduce evidence in direct contradiction to that representation. Therefore, whether termed as equitable estoppel or as a sanction for violation of my discovery orders, it was proper to limit the prejudice to Total Control by precluding certain evidence. I note also that I considered less severe sanctions and indeed ultimately allowed Danaher to argue nearly the entire substance of its argument to the jury in the context of impugning the credibility of Schultz and his damage calculations.[14]

---

**13.** Danaher also argues that Total Control waived its opportunity to object because Danaher provided Total Control with an exhibit, D–17, prior to the pretrial conference that put Total Control on notice that Danaher would argue that Minor Group 2030 included products other than C628, and Total Control failed to object to the exhibit at the Final Pretrial Conference. Defense exhibit D–17 is a twenty-two page printout of a spreadsheet containing roughly 1300 entries. (Def.'s Mot. New Trial Ex. B.) Each entry corresponds to a sale of a product in Minor Group 2030. Nearly all of the first roughly 1000 entries contain no descriptive information whatsoever. (*Id.* at 1–19.) However, those entries all have Danaher order numbers beginning with the letter "P." Danaher now asserts that this indicates that those sales were sales of Partlow West products. That may be the case; however, the letter "P" in an order number does not alone amount to meaningful notice that Danaher would argue that Minor Group 2030 includes Partlow West products.

Many of the final approximately 300 entries contain cryptic information in the column titled "Comments." (*Id.* at 19–22.) One might plausibly have inferred from reviewing those final 300 entries that Danaher would argue that Minor Group 2030 consisted of products beyond C628, including repairs and warranty contracts. However, in the context of the entire exhibit, the comments do not amount to clear enough notice such that it would have been fair to Total Control to preclude them from objecting to the exhibit at trial.

**14.** For that matter, Total Control proposed more severe sanctions. It moved for judgment as a matter of law on the question of

### C. Minor Group 8010

Danaher makes a similar argument with respect to what it terms the preclusion of evidence relating to Minor Group 8010. However, Danaher waived its right to object on this ground. I initially did rule that a defense exhibit pertaining to Minor Group 8010, exhibit D–18, and certain testimony relating to Minor Group 8010 would be precluded for analogous reasons to the evidence relating to Minor Group 2030. Upon the conclusion of our first discussion regarding Minor Group 2030, while the jury was being summoned back to the courtroom, the following exchange occurred:

> MR. TORCHIA [COUNSEL FOR DANAHER]: Your Honor, I'm not trying to complicate things. We do have another exhibit which is related to 20/30, which is the 80/10. I don't know if there's the same objection to that.
>
> THE COURT: Same objection, I'm sure. Is it the same objection?
>
> MS. KRAMER [COUNSEL FOR TOTAL CONTROL]: Yes, your Honor.
>
> THE COURT: All right, the same ruling. Let's go on.

(Tr. Sept. 13, 2004, at 60:6–14.) However, I later reconsidered this hasty ruling once I was alerted to the fact that the justification for excluding evidence relating to Minor Group 2030 did not translate to the exclusion of evidence relating to Minor Group 8010, as all parties had previously assumed. The following discussion occurred the day after I issued my initial ruling on evidence relating to Minor Group 8010:

> MR. TORCHIA: The position is, your Honor, that it's, you know, obviously, as we just said we disagree with the ruling

on D–17 [the precluded exhibit relating to Minor Group 2030], but I understand the reason for D–17. D–18 is just not the same. And what you should—

> THE COURT: I agree with that and I was—I perhaps didn't give you, because of what happened yesterday you didn't get a chance to adequately argue [D–18]. . . . Can you do that without opening the testimony?
>
> MR. TORCHIA: Your Honor, our preference would be to open the testimony to Mr. Fitzhugh. If I'm allowed to use D–18 and, again, we have a sample of the shipping report. If I'm allowed to argue that they don't get Minor Group 80/10 and because M[e]tuchen Printheads are house accounts which is essentially what we would argue then I'm fine without opening the testimony.
>
> THE COURT: All right, well, that's fine. I'll allow you to argue that.

> .     .     .     .     .

> THE COURT: I will allow the admission of—I will receive D–18.

(*Id.* at 19:14–20:12.) Therefore, Danaher clearly waived its right to object at this stage to any preclusion of evidence relating to Minor Group 8010.

### D. Veeder Root Digital Products Group

■ Danaher argues that there was insufficient evidence for the jury to find that sales of voting machines, military instruments and vehicle products were within the scope of the Agreement, as amended. The jury awarded a total of $818,736 in damages on these categories of products. There is evidence in the record from which a jury could have concluded that these

---

whether it was entitled to commissions on the entirety of Minor Group 2030, as it was undisputed that Total Control was entitled to commissions on the C628 products. However, I

denied the motion and allowed Danaher to argue using exhibits extracted from evidence already in the record that Minor Group 2030 consisted of more than the C628 product.

products were covered by both the original Agreement as well as the February 21, 1991 amendment to the Agreement.

The original Agreement provided that Danaher would pay commissions to Total Control on sales of "Dynapar name brand digital equipment and controls." *Total Control, Inc. v. Danaher Corp.,* 324 F.Supp.2d 658, 663 (E.D.Pa.2004). There is evidence in the record that Danaher Controls was a successor to Dynapar under the contract. (Tr. Sept. 10, 2004, at 13:19–14:2.) There is also evidence in the record that voting machines, hub odometers, and military products were Danaher Controls products. (Tr. Sept. 13, 2004, at 21:5–9.) Finally, there is evidence in the record that those products are digital products within the meaning of the Agreement. (Tr. Sept. 8, 2004, at 93:1–10; 95:2–7; 98:24–99:5; 104:2–14.) Therefore, a reasonable jury could have concluded that those products were within the scope of the original Agreement.

In fact, Danaher does not appear to dispute that there was evidence to support a finding that voting machines, vehicle products, and military products fell within the scope of the original Agreement. Rather, Danaher argues that plaintiff should not have been permitted to present this purportedly new theory at trial, under which the products were covered by the original Agreement as opposed to the February 21, 1991 expansion of the scope of the Agreement. Danaher argues that it was prejudicial error for me to permit Total Control to proceed under the new theory and also suggests that the theory was barred by my earlier summary judgment opinion in the case.

Danaher confuses my discussion in the summary judgment opinion of the February 21, 1991 amendment to the Agreement with my discussion of the amended agreement as a whole. In the summary judg-ment opinion, I ruled that the amendment "augments the products Total Control represents to include all products that: 1) were sold by the Veeder Root Digital Products Group in 1991, and 2) were merged into the Dynapar product line." *Total Control, Inc.,* 324 F.Supp.2d at 664. However, I ruled that in its entirety the "plain language of the amended Agreement limits Total Control only to commissions on Dynapar products that are digital equipment and controls and products that were both sold by the Veeder Root Digital Products Group in 1991 and merged into the Dynapar product line." *Id.* Nothing in this ruling precluded Total Control from pursuing a theory that voting machines, vehicle products, and military products fell within the scope of the original agreement. Nor is there anything surprising or novel about Total Control arguing that the products fell within the scope of the Agreement on which the entire litigation was premised.

In any event, a reasonable jury could have also concluded that the products fell within the scope of the February 21, 1991 amendment to the Agreement. As I ruled previously, to fall within the scope of the amendment the products must have been "both sold by the Veeder Root Digital Products Group in 1991 and merged into the Dynapar product line." *Total Control, Inc.,* 324 F.Supp.2d at 664. There was evidence in the record from which a jury could find both elements of the test to be met with respect to voting machines, vehicle products, and military products. (Tr. Sept. 8, 2004, at 75:15–79:8; Tr. Sept. 9, 2004, at 158:11–159:20; 169:20–170:2; Tr. Sept. 10, 2004, at 103:19–104:16.)

## E. House Accounts and Customary Commissions

In its motion for a new trial, Danaher reargues the merits of its case with re-

spect to whether some of Total Control's claimed unpaid commissions were actually "house accounts" that Danaher had the right to handle directly without paying commissions to Total Control, and also with respect to whether Total Control's commissions had risen ten percent over "prior year" sales thereby triggering the longer notice requirement prior to termination. I previously ruled that there were disputed issues of fact regarding: 1) "whether the Agreement which permits Danaher to 'handle directly any account in the agent's territory' authorizes Danaher to sell directly to clients in Total Control's territory without paying Total Control commissions on those accounts;" and 2) "what time period is referred to by the term 'prior year' in the December 1998 amendment." *Total Control, Inc.*, 324 F.Supp.2d at 666. The jury quite clearly found in favor of Total Control on these questions, and against Danaher. There is ample evidence in the record supporting both findings. (*E.g.,* Def. Ex. 2; Tr. Sept. 8, 2004, at 69:3–70:15; Tr. Sept. 9, 2004, at 78:12–79:11; Tr. Sept. 10, 2004, at 82:5–83:1, 88:12–25; Pl.Ex. 2; Tr. Sept. 8, 2004, at 83:18–85:9; 186:2–187:18; 198:22–199:7; Tr. Sept. 10, 2004, at 14:11–19; Tr. Sept. 9, 2004, at 34:20–36:20, 140:6–141:17; Tr. Sept. 13, 2004, at 75:17–78:11.)

### F. Expert Testimony

Danaher renews its argument that the testimony of Total Control's expert should have been excluded. I reaffirm my earlier decision on this question. *Total Control, Inc. v. Danaher Corp.,* 338 F.Supp.2d 566 (E.D.Pa.2004). I only state clearly now that the testimony of Total Control's expert was not needlessly cumulative.

Danaher also argues that I erred when I refused to sequester Total Control's expert witness during the testimony of Schultz. (Tr. Sept. 8, 2004, at 6.) However, even

accepting without deciding Danaher's argument that the expert should have been sequestered under Fed.R.Evid. 615, Danaher has shown no prejudice resulting from the failure to sequester, and therefore a new trial is not appropriate.

### G. Plaintiff's and Plaintiff's Counsel Alleged Misconduct

Finally, Danaher moves for a new trial on the basis that plaintiff and plaintiff's counsel engaged in misconduct. This argument bears little discussion. Suffice it to say that I find there was no fraud, misrepresentation or other misconduct on plaintiff's or plaintiff's counsel's behalf that merits relief from judgment. Fed.R.Civ.P. 60(b).

### V. Conclusion

For the reasons discussed above, Total Control's motion to amend the judgment or in the alternative for a new trial is denied.

### *ORDER*

**AND NOW,** this _____ day of March, 2005, it is **ORDERED** that defendants' motion to amend the judgment or for a new trial (docket # 164) is **DENIED**.